## UNITED STATES *v.* TRINIDAD COAL AND COKING COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

No. 774. Argued October 29, 30, 1890. — Decided November 17, 1890.

Officers, stockholders and employés of a private corporation formed a scheme whereby they made entries in their individual names, but really for the benefit of such corporation, of vacant coal lands of the United States. The scheme was carried out, and patents were issued to such individuals, who immediately conveyed the legal title to the corporation, which bore all the expenses and cost of obtaining the lands, and some of the members of which had previously taken the benefit of the statute relating to the disposal of the public coal lands : *Held,*

(1) That such a transaction was in violation of sections 2347, 2348 and 2350 of the Revised Statutes ;

(2) That it was not necessary to the right of the United States to maintain a suit to set aside such patents as void, that the government should offer to refund to the corporation the moneys advanced by it to the patentees in order to obtain the lands, and which the latter paid to the officers of the United States ;

(3) That the rule that a suitor, asking equity, must do equity, should not be enforced in such a case as this ;

(4) That if the corporation be entitled, upon a cancellation of the patents so obtained, to a return of such moneys, it must be assumed that Congress will make an appropriation for that purpose when it becomes necessary to do so.

A private corporation is an association of persons within the meaning of those sections.

THIS was a suit in equity by the United States against the Trinidad Coal and Coking Company, a corporation created under the laws of Colorado and engaged in the business of mining coal. The defendant held the legal title to six tracts of coal land within the Pueblo Land District, in the county of

Las Animas, in that State, containing in the aggregate 954 and 34-100 acres, under conveyances executed to it by various individuals to be presently named, and to whom, respectively, patents were issued.

The relief sought by the government was a decree setting aside these patents, and declaring them void and of no effect as against the United States. The defendant demurred to the bill upon the ground that it did not make a case for relief in a court of equity, nor allege that any of the entries were fraudulent or in contravention of law. The demurrer was sustained and the bill dismissed, the opinion of the court being reported in 37 Fed. Rep. 180. The sole question was whether the United States was entitled upon the showing made by the bill to the relief it asked.

Taking the allegations of the bill to be true, the case made by the government was as follows:

On or about the 4th of June, 1883, T. J. Peter and Robert Savage were officers and stockholders, and William H. Leffingwell, Milford N. Wells, Alexander Craigmyle, Charles F. Schuman and Thomas Winsheimer, were employés of the defendant corporation. Peter, Savage, and certain other officers and members of that corporation, whose names are unknown to the government, together with Leffingwell, Wells, Craigmyle, Schuman and Winsheimer, formed a scheme to procure patents for these lands "for the benefit and on behalf of said defendant corporation, and for the purpose of enabling said corporation to fraudulently obtain titles" from the United States for its "coal lands in excess of 320 acres, contrary to the statutes of the United States in such cases made and provided." In furtherance of that scheme the persons just named, and those associated with them, or some one of them, or some one acting for them and in their behalf, on or about the day above named, wrote and prepared, or caused to be written and prepared, certain affidavits, one of which was in substance and to the effect that "no portion of the tract of land described as the northeast quarter of section six, township thirty-four south, of range sixty-three, west of the sixth principal meridian, and containing one hundred and fifty-two and 53-100ths

acres, was in the possession of any other party; that said Robert Savage was twenty-one years of age, a citizen of the United States, and had never held nor purchased, as an individual or as a member of any association, lands under the laws of the United States relating to the sale of coal lands of the United States; that he, the said Savage, was well acquainted with the character of said land and with every legal subdivision thereof, and had frequently passed over the same; that his knowledge of said land was such as to enable him to testify understandingly in regard thereto; that said land contained large deposits of coal, and was chiefly valuable therefor; that there was not, to his knowledge, within the limits thereof, any vein, or lode of quartz or other rock in place, bearing gold, silver or copper; and that there was not within the limits of said land, to his knowledge, any valuable deposits of gold, silver or copper." This affidavit was subscribed and sworn to by Savage on the 4th of June, 1883, before the register of the Land Office at Pueblo. The other affidavit, subscribed and sworn to before the same officer by Leffingwell and Wells, set forth in substance the same facts as being within their knowledge.

The conspirators, or some one or more of them, or some one acting for them, on or about the same date, filed these affidavits in the Land Office at Pueblo, and made application, in the name and on behalf of Savage, to enter and purchase, under the Statutes of the United States, this tract of one hundred and fifty-two and $\frac{53}{100}$ acres, as vacant coal land; and at the same time there was paid to the receiver of public moneys at that office the sum of three thousand and fifty and $\frac{60}{100}$ dollars as the purchase price of the tract at twenty dollars per acre. Thereupon the register issued in duplicate a certificate to the effect that Savage had on that day purchased this land from that officer at the price stated; that the payment of the price had been made in full as required by law; and that, on the presentation of the certificate to the Commissioner of the General Land Office, he would be entitled to receive a patent for the land. Upon the payment of this money and the issuing of the certificate, the receiver delivered to Savage, or to the conspirators, or to some one of them, or to some one for

them, in duplicate, a receipt which in effect acknowledged that he had paid the above sum as and for the price of the land at twenty dollars per acre. This being done, the register and receiver forwarded the papers, affidavits, applications, and one of the certificates and receipts to the General Land Office at Washington, delivering the other duplicate certificate to the conspirators, or to some one of them, or to some one acting for them, " such delivery purporting to be for and on behalf of the said Robert Savage."

Similar applications and affidavits were prepared and filed, at the instance of the same persons, in behalf of Leffingwell, Wells, Craigmyle, Schuman, and Winsheimer, respectively, in reference to the remaining tracts, and they severally procured patents to be issued, as follows: To Savage for 152 and $\frac{53}{100}$ acres; to Leffingwell, Craigmyle, Schuman and Winsheimer, each, for 160 acres; and to Wells for 161 and $\frac{81}{100}$ acres. The government, relying upon such affidavits and certificates, believing that the lands were legally entered by each individual for his own use and benefit, and in ignorance of the conspiracy and its objects, issued patents for the several tracts, purporting thereby to convey all its rights, title, interest and estate therein to the parties, respectively, in whose names the entries were made. The patents were subsequently delivered to the patentees or to some one representing them and acting in their name.

It, also, appeared from the bill that Savage, Leffingwell, Wells, Craigmyle, Schuman and Winsheimer did not enter the lands for their own use and benefit, nor for the use and benefit of any of them, but for the direct use and benefit of the Trinidad Coal and Coking Company; that its officers procured the entrymen to go in a body to the city of Pueblo to file the above papers, as stated; that the papers and affidavits were drawn and prepared by its officers; that the expenses of the conspirators in going to that city to make the entries were paid by its officers, acting for it and in its behalf; that the entire purchase money for all the tracts and all land-office fees, costs and expenses were paid by the company; that immediately after the filing of the affidavits in the land office,

and the pretended entries, Savage, Leffingwell, Wells, Craig-myle, Schuman and Winsheimer, and each of them, executed and delivered to the company warranty deeds conveying to it each of said tracts; that the company immediately entered into possession, and has possessed and claimed the lands until the present time; that no one of the patentees had ever claimed or asserted any right or interest in them, or in any of them, by virtue of the above fraudulent and illegal entries; that the entries were in reality and effect a purchase of the lands by the company; and that the entries and purchases by the persons named were only a device to evade the laws of the United States and to procure for the defendant a greater amount of coal lands than it could legally purchase and hold.

The bill further alleged that these entries of coal lands were illegal for the additional reason that, prior to the fourth of June, 1883, Peter, being an officer and stockholder of the company, had, on the fifth day of August, 1881, entered and purchased under the laws of the United States one hundred and sixty acres of vacant coal land, and other officers and stockholders of the company, namely, Charles P. Teat, Joseph L. Prentiss, Orlando B. Wheeler and others whose names are unknown to the government, had purchased tracts of coal land of the United States, all of which, entered and purchased by T. J. Peter and by such other officers and stockholders of the company, were, on the fourth day of June, 1883, held and owned by the defendant, and were in the aggregate in excess of three hundred and twenty acres of coal land; that neither the company nor any member or officer of it, for its own benefit or in its behalf, could then legally enter or purchase additional coal lands from the government; and that when said tracts were conveyed to it by the several patentees it had full notice of the alleged fraudulent scheme, as well as of the fact that the lands were being entered and purchased for its benefit exclusively.

*Mr. Assistant Attorney General Maury* for appellant.

*Mr. Charles E. Gast* and *Mr. A. B. Browne* for appellee. *Mr. George R. Peck* and *Mr. A. T. Britton* were with them on the brief.

Mr. Justice Harlan delivered the opinion of the court.

The patents in question were based upon entries made under sections 2347, 2348, 2350 and 2352 of the Revised Statutes, which embody substantially provisions in an act of Congress approved March 3, 1873, entitled "*An act to provide for the Sale of the Lands of the United States containing Coal.*" 17 Stat. 607–8, c. 279.   These sections are as follows:

"Sec. 2347. Every person above the age of twenty-one years, who is a citizen of the United States, or who has declared his intention to become such, or any association of persons severally qualified as above, shall, upon application to the register of the proper land office, have the right to enter, by legal subdivisions, any quantity of vacant coal lands of the United States not otherwise appropriated or reserved by competent authority, not exceeding one hundred and sixty acres to such individual person, or three hundred and twenty acres to such association, upon payment to the receiver of not less than ten dollars per acre for such lands, where the same shall be situated more than fifteen miles from any completed railroad, and not less than twenty dollars per acre for such lands as shall be within fifteen miles of such road.

"Sec. 2348. Any person or association of persons severally qualified, as above provided, who have opened and improved, or shall hereafter open and improve, any coal mine or mines upon the public lands, and shall be in actual possession of the same, shall be entitled to a preference-right of entry, under the preceding section, of the mines so opened and improved: *Provided,* That when any association of not less than four persons, severally qualified as above provided, shall have expended not less than five thousand dollars in working and improving any such mine or mines, such association may enter not exceeding six hundred and forty acres, including such mining improvements."

"Sec. 2350. The three preceding sections shall be held to authorize only one entry by the same person or association of persons; and no association of persons any member of which shall have taken the benefit of such sections, either as an

individual or as a member of any other association, shall enter or hold any other lands under the provisions thereof; and no member of any association which shall have taken the benefit of such sections shall enter or hold any other lands under their provisions; and all persons claiming under section twenty-three hundred and forty-eight shall be required to prove their respective rights, and pay for the lands filed upon within one year from the time prescribed for filing their respective claims; and upon failure to file the proper notice, or to pay for the land within the required period, the same shall be subject to entry by any other qualified applicant."

"SEC. 2352. Nothing in the five preceding sections shall be construed to destroy or impair any rights which may have attached prior to the third day of March, eighteen hundred and seventy-three, or to authorize the sale of lands valuable for mines of gold, silver or copper."

The restrictions imposed upon the entry and purchase of the vacant coal lands of the United States have been so clearly expressed that no doubt can exist as to the intention of Congress in enacting the above sections. The statute authorizes an association of persons to enter not exceeding three hundred and twenty acres, and provides that only one entry can be made by the same person or association, and that "no association of persons, any member of which shall have taken the benefit of such sections, either as an individual or as a member of any other association, shall enter or hold any other lands under the provisions thereof."

It is contended that the case made by the bill is not within the prohibitions of the statute, although the demurrer admits that the Trinidad Coal and Coking Company acquired the lands in dispute pursuant to a scheme whereby the several tracts were to be entered for its benefit, in the name of certain persons, its officers, stockholders and employés — the title, when thus obtained, to be conveyed to the company, which should, and did, bear all the expenses attending the entries and purchases from the government. This contention cannot be sustained unless the court lends its aid to make successful a mere device to evade the statute. The policy

adopted for disposing of the vacant coal lands of the United States should not be frustrated in this way. It was for Congress to prescribe the conditions under which individuals and associations of individuals might acquire these lands, and its intention should not be defeated by a narrow construction of the statute. If the scheme described in the bill be upheld as consistent with the statute, it is easy to see that the prohibition upon an association entering more than three hundred and twenty acres, or entering or holding additional coal lands, where one of its members has taken the benefit of its provisions, would be of no value whatever. It is true, in the present case, that some of the persons who made the entries in question, were not, strictly speaking, members of the corporation, but only its employés. But as they were parties to the alleged scheme, and were, in fact, agents of the defendant in obtaining from the government coal lands that could not rightfully have been entered in its own name, that circumstance is not controlling. Besides, it appears from the bill that when that scheme was formed and executed, Peter and other officers and stockholders of the association had taken the benefit of the statute, and that the lands originally entered and purchased by them were then held and owned by the company, and were in excess of three hundred and twenty acres. There is, consequently, in view of all the allegations of the bill, no escape from the conclusion that the lands in question were fraudulently obtained from the United States. We say fraudulently obtained, because if the facts admitted by the demurrer had been set out in the papers filed in the land office, the patent sought to be cancelled could not have been issued without violating the statute. The defendant would not have been permitted to do indirectly that which it could not do directly. If the patents could not have been rightfully issued upon papers disclosing the fact that Savage, Leffingwell, Wells, Craigmyle, Schuman and Winsheimer were really acting in behalf of and as the agents of an association which was to meet all the expenses attending the applications, and which already held and owned coal lands formerly belonging to the United States, and under conveyances from some

of its members who had previously taken the benefit of the statute, it is difficult to perceive why the bill does not make a case entitling the government to the relief asked. These views are in accordance with the practice in the Department of the Interior. *Adolph Petersen et al.*, 6 Land Dec. 371; *Northern Pac. Coal Co.*, 7 Land Dec. 422.

It is confidently asserted by the company that the individuals making entries who were citizens of the United States, and not members of an association of persons, had a right, under the statute, and upon their own responsibility, to enter, each, the quantity of coal lands for which they respectively received patents, and that, having obtained patents, they were at liberty to dispose of the lands as they saw proper, even to an association of persons which, or some member of which, had already taken the full benefit of the statute. Whether this be so or not, nothing else appearing than is just stated, we need not now decide. The case before us is not of that class. It is the case of an association seeking to evade an act of Congress by using, for its own benefit, the names of both its members and employés to obtain from the government vacant coal lands, which it could not legally obtain upon entries made in its own name, and which it was expressly forbidden to enter by reason of some of its members having previously taken the benefit of the statute.

In *McKinley* v. *Wheeler*, 130 U. S. 630, 636, it was decided that section 2319 of the Revised Statutes, declaring valuable mineral deposits in lands belonging to the United States to be free and open to exploration and purchase, and the lands in which they were found to occupation and purchase by citizens of the United States and those who have declared their intention to become such, did not preclude a private corporation, formed under the laws of a State, whose members were citizens of the United States, from locating a mining claim on the public lands of the United States. Thus far it has been assumed that the defendant, although an incorporated company, is an "association of persons" within the meaning of the statute relating exclusively to the vacant coal lands of the government, and, as such, is subject to the restriction as to the num-

ber of acres of such lands that may be entered in its name. We have seen that the right to enter such lands is given only to persons above the age of twenty-one years who are citizens of the United States, or have declared their intention to become such, and to associations of persons, severally so qualified; and each person of the former class is permitted to enter not exceeding one hundred and sixty acres, while "associations of persons," severally qualified as above, may enter not exceeding three hundred and twenty acres. § 2347. The object of these restrictions as to quantity was, manifestly, to prevent monopolies in those coal lands. The reasons that suggested the prohibitions in respect to associations of persons apply equally to incorporated and unincorporated associations. But the purpose of the government would be defeated altogether, if it should be held that corporations were not "associations of persons" within the meaning of the statute, and subject to the restrictions imposed upon the latter by sections 2347 and 2350. It is unreasonable to suppose that Congress intended to limit the right of entering coal lands to one hundred and sixty acres in the case of an individual, and to three hundred and twenty acres in the case of an unincorporated association, and leave the way open for an incorporated association, by means of entries made for its benefit in the names of its agents, officers, stockholders, employés and agents, to acquire public coal lands without any restriction whatever as to quantity. The language of the statute, to say nothing of the policy which underlies it, does not require or permit any such interpretation of its provisions. The words "association of persons" are often, and not inaptly, employed to describe a corporation. An incorporated company is an association of individuals acting as a single person, and by their corporate name. As this court has said, "private corporations are but associations of individuals united for some common purpose, and permitted by the law to use a common name, and to change its members without a dissolution of the association." *Baltimore and Potomac Railroad* v. *Fifth Baptist Church*, 108 U. S. 317, 330.

One other point discussed at the bar deserves consideration.

It is contended by the defendant that the United States is subject, as a suitor, to the same rules that control courts of equity when determining, as between private persons, whether particular relief should be granted ; that the government, asking equity, must do equity ; and, consequently, that the bill is defective in not containing a distinct offer to refund the moneys which, it is alleged, were furnished by the defendant to the several persons to whom patents were issued.   The rule referred to should not be enforced in a case like the present one.   In the matter of disposing of the vacant coal lands of the United States, the government should not be regarded as occupying the attitude of a mere seller of real estate for its market value.   It is not to be presumed that the small price per acre required from those desiring to obtain a title to such lands had any influence in determining the policy to be adopted in opening them to entry.   They were held in trust for all the people; and in making regulations for disposing of them, Congress took no thought of their pecuniary value, but, in the discharge of a high public duty and in the interest of the whole country, sought to develop the material resources of the United States by opening its vacant coal lands to entry by individuals and by associations of persons at prices below their actual value.   The controlling object of this and similar suits is to enforce a public statute against those who have violated its provisions.   It is not disputed that the Attorney General may, in virtue of the authority vested in him, institute this suit.   According to the allegations of the bill, which are admitted to be true, the defendant is a wrongdoer against whom the government seeks to vindicate its policy in reference to the development of its vacant coal lands.   Congress, when establishing that policy, was not bound to assume that individuals or associations of individuals would attempt to defeat it by means of fraudulent schemes or otherwise.   If the defendant is entitled, upon a cancellation of the patents fraudulently and illegally obtained from the United States, in the name of others, for its benefit, to a return of the moneys furnished to its agents in order to procure such patents, we must assume that Congress will make an appropriation for that

purpose, when it becomes necessary to do so. The proposition that the defendant, having violated a public statute in obtaining public lands that were dedicated to other purposes, cannot be required to surrender them until it has been reimbursed the amount expended by it in procuring the legal title, is not within the reason of the ordinary rule that one who seeks equity must do equity; and, if sustained, would interfere with the prompt and efficient administration of the public domain. Let the wrongdoer first restore what it confesses to have obtained from the government by means of a fraudulent scheme formed by its officers, stockholders and employés in violation of law.

*The decree is reversed, with directions to overrule the demurrer, and for further proceedings not inconsistent with this opinion.*