UNITED STATES v. ALLEN et al.

(Circuit Court, W. D. Washington, W. D.   January 26, 1910.)

No. 1,072.

1. MINES AND MINERALS (§ 45*)—ENTRY OF COAL LANDS—CANCELLATION OF PATENTS—FRAUD.

Evidence *held* to show that two patents of public coal lands running to two persons were acquired as part of a general plan for procuring title in behalf of a single association to an area of coal lands in excess of the limits prescribed by law.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 131; Dec. Dig. § 45.]

2. MINES AND MINERALS (§ 42*)—ENTRY OF COAL LANDS—PATENTS—VALIDITY —FRAUD.

Where two persons were engaged in an unlawful combination to procure title in behalf of a single association to an area of coal lands in excess of the limits prescribed by law, that only two claims aggregating 320 acres allowed by Rev. St. § 2347 (U. S. Comp. St. 1901, p. 1440), were actually patented to them, would not make the patents valid; the unlawful combination making the proceeding illegal from the beginning.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 123; Dec. Dig. § 42.*]

3. MINES AND MINERALS (§ 45*)—VOIDABLE PATENT—CANCELLATION—BONA FIDE PURCHASER.

A corporation was formed to take over two patented coal land claims, the patents being in fact voidable, having been illegally obtained, one of the incorporators being father of the patent holder, and he and another

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

incorporator having been parties to the transaction whereby the patents were obtained. The holder of the patent subscribed for all but four shares of the capital stock and sold to the corporation the two claims in payment of her subscription. Upon issuance to her of the shares she immediately transferred part of them to the treasurer of the company to be sold for the company's use. She was made secretary of the corporation and her father manager, and they continued to hold those offices until the present time, covering a period of five years. *Held,* that the corporation was not a bona fide purchaser for value without notice precluding the government from proceeding to cancel the patents, as one holding a voidable patent to public lands cannot protect himself against the process of the government by forming a corporation in which he is the dominant factor and conveying to it the premises which he has acquired in violation of law.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 131; Dec. Dig. § 45.*]

In Equity. Action by the United States of America against Watson Allen and others. Decree for complainants.

Elmer E. Todd, U. S. Dist. Atty., and Henry M. Hoyt, Sp. Asst. U. S. Atty.

Graves & Murphy, for defendants Helen Pack Wilson and Wilson Coal Company.

DONWORTH, District Judge. The object of this suit is to cancel a patent issued to the defendant Helen Pack Wilson, covering the northwest quarter of section 10 in township 14 north of range 1 west of the Willamette meridian, situated in Lewis county in the Vancouver land district, in this state. Defendants Watson Allen and wife are merely nominal parties and have filed a disclaimer. The defendants really interested in the controversy are Helen Pack Wilson and Wilson Coal Company. As the basis of the suit, complainants charge that the patent was obtained by fraudulent evasion of the provisions of the statutes (Rev. St. §§ 2347–2351 [U. S. Comp. St. 1901, pp. 1440, 1441]) governing the disposition of the vacant coal lands of the United States. The evidence leaves this issue free from doubt. The contention of the government is so clearly established that any detailed reference to the proof would be a work of supererogation. The important facts, however, may be recapitulated.

Some time prior to the year 1901, R. A. Wilson and his son George B. Wilson became aware of the existence of coal on certain public lands in Lewis county. They and several of their acquaintances filed declaratory statements in the Vancouver land office for the acquisition of a number of quarter sections of such lands; all the claims either adjoining or being in close proximity. When the time came for making entry and payment, the proceedings thus initiated were suffered to lapse, probably by reason of inability to make payment in accordance with the terms of the statute, $3,200 for each claim. Among those who filed these declaratory statements and allowed them to lapse was L. G. Wilson, a nephew of R. A. Wilson. The several members of the Wilson family were evidently acting in concert and composed in fact an association of persons formed for the purpose

of acquiring coal lands. Their conduct clearly proves this. R. A. Wilson was the head of the association and managed and directed the proceedings for all. After the abandonment of the first proceedings, he was still of the opinion that a successful financial venture could be made by the acquisition and development of these coal lands, and in February and March, 1901, he caused new declaratory statements to be filed, as follows:

"Coal declaratory statement No. 506, by Helen Pack Wilson for the northwest quarter of section ten (10), township fourteen (14) north, range one (1) west, W. M., filed February 20th, 1901.

"Coal declaratory statement No. 507 by Katie Roberts Wilson for the southwest quarter (¼) of the northeast quarter, and west half (½) of the southeast quarter (¼) of section ten (10), township fourteen (14) north, range one (1) west, W. M., filed February 27th, 1901.

"Coal declaratory statement No. 508 by Minn Marie Wilson for the east half (½) of the northeast quarter (¼) and the east half (½) of the southeast quarter (¼) of section ten (10) township fourteen (14) north, range one (1) west, W. M., filed February 27th, 1901.

"Coal declaratory statement No. 509 by James R. Winston for the northwest quarter (¼) of section fourteen (14) township fourteen (14) north, range one (1) west, W. M., filed February 27th, 1901.

"Coal declaratory statement No. 511 by Salomon Lauridsen and Henry Kamps, as an association, for the southeast quarter (¼) of the northeast quarter (¼), east half (½) of the southwest quarter, (¼), and the southeast quarter of section four (4), township fourteen (14) north, range one (1) west, filed March 26th, 1901."

These several locators were all acting in concert, and R. A. Wilson was their joint representative. Helen Pack Wilson and Minn Marie Wilson are his unmarried daughters, who at that time, and for a considerable time thereafter, lived with him at his home in Seattle. Katie Roberts Wilson is the wife of L. G. Wilson. Later Virgil R. Wilson, another nephew of R. A. Wilson, made application to enter as coal lands the southwest quarter of the same section 10 above mentioned, on the understanding that he would receive about $500 for his services in procuring the land and would turn it over to the interests controlling the other claims. Neither R. A. Wilson nor any of his associates had sufficient means to make payment for the lands at the land office and provide for development work, and they endeavored to find some person who would finance their enterprise. In May, 1901, R. A. Wilson made the acquaintance of P. C. Richardson and succeeded in making a financial arrangement with him. Richardson did not have much money, but he had some Seattle real estate and a steamboat on the Yukon river, both of which he expected to be able to convert into cash, and to realize therefrom about $21,000 for the business venture. Pursuant to this understanding between R. A. Wilson and Richardson, the Sterling Coal Company was formed under the laws of the state of Oregon; its capital stock being fixed at $500,000, and the incorporators being R. A. Wilson, George B. Wilson, and one resident of Oregon who had no real interest in the company. When that company was organized, R. A. Wilson and Richardson's attorney made a written proposition to the company reciting that they held title by warranty deed to 1,040 acres of coal and timber land in Lewis county, Wash. (describing it),

giving its estimated value as $500,000 and offering to sell and convey it to the company in full payment of the capital stock. This proposition the company accepted. The lands so described included the quarter section involved in this suit and the other lands above described, though none of the claims had then reached the stage of payment and entry.

To assure the company that the proposition would be carried out, the several locators (including Helen Pack Wilson and Minn Marie Wilson) made deeds conveying the lands to R. A. Wilson, and he executed a declaration of trust stating that he held the conveyances in trust for the company. None of the deeds nor the declaration of trust was placed on public record. Richardson succeeded in selling his Seattle property and paid $8,300 into the hands of George B. Wilson as treasurer of the Sterling Coal Company. Richardson also put the Yukon river steamboat at the disposition of the company; but nothing was ever realized from that asset, chiefly by reason of the subsequent falling out between the Wilsons and Richardson. In March, 1902, Helen Pack Wilson and Virgil Wilson duly entered their claims at the Vancouver land office. The $6,400 paid to the government at that time for these two claims was taken from the treasury of the Sterling Coal Company by George B. Wilson and was a part of the money which Richardson had realized from the sale of his Seattle lots. The funds of the Sterling Coal Company also paid for the development work done on the claims and probably paid the expenses of the witnesses who went to Vancouver to testify before the land office authorities at the hearing at the time of entry. Before the time for entry arrived, however, the attorney representing the Wilsons before the land office stated to them that the lands could not be legally entered while the deeds executed to R. A. Wilson in trust for the company were outstanding, and the deeds were therefore returned to the grantors and destroyed. About the beginning of the year 1902, R. A. Wilson and Richardson each endeavored to secure for himself control of a majority of the stock of the Sterling Coal Company, with the result that at the annual meeting held in January of that year Richardson and persons friendly to him succeeded in voting a majority of the stock, whereupon R. A. Wilson and George B. Wilson withdrew from the stockholders' meeting. From that time forward the Wilsons and Richardson were antagonistic, and shortly thereafter a complete break took place between the Wilsons and the Sterling Coal Company. The Wilsons have never admitted that the money paid to the government for the two patented claims was the same money that Richardson had paid into the treasury of the Sterling Coal Company, but that such is the fact is too plain for argument. Richardson made a total loss, so far as the evidence shows, of his investment in that company. In due course in the months of June and September, 1902, the patents in the usual form issued to Helen Pack Wilson and Virgil R. Wilson for the two quarter sections embraced in their entries.

On September 15, 1903, the Sterling Coal Company brought a suit in equity in this court, the bill being verified by Richardson as secre-

tary, in which Robert A. Wilson, Helen Pack Wilson, Minn Marie Wilson, Kate Roberts Wilson, and L. G. Wilson, her husband, Salomon Lauridsen, Henry Kamps, and James R. Winston, were defendants. The prayer of the bill was that it be adjudged that Robert A. Wilson in the proceedings leading up to the acquisition of these claims acted as agent and trustee of the Sterling Coal Company, that the company be decreed to be the owner of the claims patented to Helen Pack Wilson and Virgil R. Wilson, and that the company have a conveyance thereof. To this bill R. A. Wilson, Helen Pack Wilson, and Minn Marie Wilson severally demurred. After argument the demurrer was sustained by Judge Hanford in a written opinion in which he called attention to the vagueness of many of the allegations and said:

"If it can be determined from the averments of the bill, after indulging in all fair inferences, that anything was agreed to with respect to the assignment of coal claims to be made to the corporation, it was an impracticable agreement, that is, something which could not be carried into effect, because the assignments to be made embraced a greater quantity of land than could be lawfully entered by an association, and it was not such an agreement as could be severed so as to be enforceable in part."

The suit was therefore dismissed in May, 1904, for want of equity on the grounds stated.

R. A. Wilson continued his endeavor to finance the property. Virgil. R. Wilson conveyed his quarter section to Minn Marie Wilson, and thus the two daughters of R. A. Wilson held the apparent legal title to the two patented claims. During this period R. A. Wilson gave to defendant Watson Allen an option on six coal claims; two of them being those held by his daughters, and the others apparently being those for which declaratory statements had been filed. The two daughters made deeds conveying the patented 320 acres to Allen with the understanding that the deeds should remain in escrow until title should be secured to the other tracts. After a delay of more than a year, the other tracts not having been acquired, Allen conveyed both claims to Helen Pack Wilson. It is because of the deeds running to Allen (which about a year after their execution were placed on record, though Allen had not consummated and never did consummate the purchase of the property) that he is made a party defendant in this suit. The declaratory statement originally made by Minn Marie Wilson was suspended by the land office authorities on their becoming acquainted with some of the facts herein mentioned, and thus the attempt to acquire the quarter section embraced in that application was defeated. For reasons not entirely disclosed, the remaining declaratory statements do not appear to have led to any results in favor of the locators.

It will thus be seen that the two patents running to Helen Pack Wilson and Virgil R. Wilson were acquired as a part of a general plan for procuring title in behalf of a single association to an area of coal lands greatly in excess of the limits prescribed by law. This case is not distinguishable in principle from that of United States v.

Trinidad Coal Co., 137 U. S. 160, 11 Sup. Ct. 57, 34 L. Ed. 640. In that case the court says:

"The restrictions imposed upon the entry and purchase of the vacant coal lands of the United States have been so clearly expressed that no doubt can exist as to the intention of Congress in enacting the above sections. The statute authorizes an association of persons to enter not exceeding 320 acres, and provides that only one entry can be made by the same person or association, and that 'no association of persons, any member of which shall have taken the benefit of such sections, either as an individual or as a member of any other association, shall enter or hold any other lands under the provisions thereof.'

"It is contended that the case made by the bill is not within the prohibitions of the statute, although the demurrer admits that the Trinidad Coal & Coking Company acquired the lands in dispute pursuant to a scheme whereby the several tracts were to be entered for its benefit, in the name of certain persons, its officers, stockholders, and employés; the title, when thus obtained, to be conveyed to the company, which should, and did, bear all the expenses attending the entries and purchases from the government. This contention cannot be sustained unless the court lends its aid to make successful a mere device to evade the statute. The policy adopted for disposing of the vacant coal lands of the United States should not be frustrated in this way. It was for Congress to prescribe the conditions under which individuals and associations of individuals might acquire these lands, and its intention should not be defeated by a narrow construction of the statute. If the scheme described in the bill be upheld as consistent with the statute, it is easy to see that the prohibition upon an association entering more than 320 acres, or entering or holding additional coal lands, where one of its members has taken the benefit of its provisions, would be of no value whatever."

In United States v. Keitel, 211 U. S. 370, 29 Sup. Ct. 123, 53 L. Ed. 230, this statement of the principles governing the construction and application of the statute was reaffirmed and declared to be applicable as well to criminal as to civil proceedings. A pooling scheme made between individual entrymen and embracing more than 320 acres of coal lands whereby each member of the combination agreed to hold each and every tract for the benefit of all, though the legal title was to remain in the several individuals, was declared unlawful by Judge Hanford in United States v. Portland Coal & Coke Co. (C. C.) 173 Fed. 566. The fact that only two claims aggregating 320 acres were actually patented cannot avail the defendants. The unlawful combination made the proceedings illegal from the beginning, and, if the true facts had been disclosed in the papers filed in the land office, the entries could not have been received. Had it not been for the action of the land office authorities in suspending the claim of Minn Marie Wilson, a third quarter section would have been acquired by the association, and the failure to procure patents to the remaining claims was not due to any purpose to comply with the limitations of the statute. The entire scheme was an attempt to evade these limitations, and public policy forbids that it should succeed in whole or in part as to any one concerned in the illegal acts. Though a different rule may apply under other statutes, the proceedings here are governed exclusively by sections 2347 to 2351 of the Revised Statutes. It is definitely settled that the prohibitions contained in section 2350 apply to all entries for such lands, whether or not there has been a prior location and possession by the entryman under sections 2348 and 2349. These two sections merely give a "preference right of entry" to a

qualified person who has opened and improved a coal mine on the public lands and is in possession of it. The entry itself is provided for by section 2347.

"Turning to section 2347, the preceding section referred to, it will be seen that the entry therein provided for is the cash entry made by applying to purchase the land, and cotemporaneously therewith making payment for the same, which entry, as we have decided in the Keitel Case, excludes the right of a qualified person to make the entry in his own name with the money and for the benefit of a disqualified person." United States v. Forrester, 211 U. S. 399, 29 Sup. Ct. 132, 53 L. Ed. 245.

The evidence satisfactorily establishes the fact that at the time of entering and paying for the two claims in question Helen Pack Wilson and Virgil R. Wilson were making the entries with the money of others and for the benefit of others as well as themselves in an attempt to secure for a single association acting as a unit a greater area of coal lands than is permitted by the law and particularly in contravention of the prohibitions of section 2350.

It remains to be considered whether the Wilson Coal Company is in any better position than the patentees of the lands. The facts material to this inquiry will now be stated.

In the summer of 1904, R. A. Wilson and George B. Wilson called at the office of L. E. Kirkpatrick, an attorney at law, who had recently come to Seattle, and told him of the coal lands. Negotiations followed with the result that Kirkpatrick agreed to form a corporation for acquiring and developing the two patented claims (then standing on the record in the name of Helen Pack Wilson) and agreed to invest therein certain money on his own account. The entire negotiations and arrangements were made between Kirkpatrick and R. A. Wilson and George B. Wilson; the daughter being called in when the terms were practically agreed upon and the execution of legal documents was required. A corporation called the Wilson Coal Company (one of the defendants here) was organized under the laws of the state of Washington, with Kirkpatrick, Helen Pack Wilson, Watson Allen, and George N. Gilson as incorporators. Allen and Gilson appear to have acted as incorporators merely as an accommodation to the parties; they subscribing to one share of stock each as a formality. The capital stock was fixed at $65,000, divided into 6,500 shares of the value of $10 each. Helen Pack Wilson subscribed for all but four shares of the stock and made a proposition at the first meeting of the company to sell to the company the two patented claims in payment of her subscription. This proposition was accepted, and accordingly she executed and delivered a deed dated October 11, 1904, conveying the two claims to the Wilson Coal Company.

As soon as the articles of incorporation of the Wilson Coal Company were filed, Richardson and his attorney, learning of that fact, called upon Kirkpatrick and told him that the Sterling Coal Company claimed to be the owner of these lands, that the Wilsons held the title for that company, that Richardson and his friends had contributed money towards buying the lands for that company, and that they desired to warn him and the Wilson Coal Company of the rights of the Sterling Coal Company. Kirkpatrick testifies that this conversation

did not suggest to his mind any idea that the land had been acquired unlawfully, as he was not familiar with the coal-land laws and did not know anything, practically speaking, about the methods of acquiring title from the government. A short time after this conversation, the Wilson Coal Company received the conveyance of the two claims from Helen Pack Wilson, and the 6,496 shares of its capital stock (fully paid) were issued to her. She immediately transferred 2,500 of these shares to the treasurer of the company to be sold for the company's use. She was also made secretary of the company and has ever since held that office. Just how much of the stock had passed to the hands of other parties before the beginning of this suit (February, 1905) does not appear. The company's stock books were not offered in evidence. It is shown, however, by Kirkpatrick, that in October and November, 1904, he had taken 600 shares (par value $10 each) at 50 cents on the dollar, and two other persons took 100 shares and 50 shares respectively; one paying cash to the company, and the other agreeing to pay in labor. At the time the evidence was taken (July, 1908) the stock had been increased, and about 8,500 or 9,000 shares were outstanding. Of these Helen Pack Wilson then held 3,600 shares. Kirkpatrick had increased his holdings to 1,000 shares. In addition to the two Wilson coal claims, the company acquired an adjoining 40-acre tract. Its mining operations have been of an active character, but have been almost wholly confined to the 40-acre tract. R. A. Wilson has been its manager.

These facts, in my opinion, fall far short of putting the Wilson Coal Company in the position of a bona fide purchaser for value without notice. A person who holds a voidable patent to public lands cannot protect himself against the process of the government by forming a corporation in which he is the dominant factor and conveying to it the premises which he has acquired in violation of law. So far as the evidence discloses, at the time of the commencement of this suit the holdings of Helen Pack Wilson and the treasury stock composed all but 750 shares out of the 6,500 shares constituting the company's capital stock. I have stated somewhat fully the circumstances which the government claims to have charged Kirkpatrick with notice of the invalidity of the Wilson title before he made any investment in the company. It may be questioned whether those circumstances would have been sufficient to charge him with notice if he had purchased the land, considering the respect due to a United States patent and the scant attention usually paid to claims of a defeated litigant. But that question I am not called upon to decide. That Kirkpatrick is free from any suggestion of wrongdoing is clear beyond question, and the only claim is that the circumstances were sufficient to impose upon him the duty of investigating further. However, it was the corporation that became the grantee of the land. Kirkpatrick and others only acquired some of the stock that the corporation issued to Helen Pack Wilson in return therefor. R. A. Wilson, the real party who arranged with Kirkpatrick for the corporate transaction and became the corporation's business manager, and Helen Pack Wilson, who received practically all of the corporate stock and became its

secretary, were fully informed of the facts affecting the title, and their knowledge was the knowledge of the corporation. It is to be regretted that, before the government brought suit, some apparently innocent parties had acquired stock; but, if that fact should be considered sufficient to nullify the knowledge which the corporation had already acquired, it would be practically impossible to make any corporation restore property illegally obtained. Changes in the holdings of stock of corporations occur with more or less frequency. One of the risks that are taken by purchasers of corporate stock is that, by reason of facts known to the officers of the corporation and the persons in control of affairs, its title to its apparent assets may not be as secure as the public records seem to indicate. The fact that transfers of the stock of a corporation have taken place may, in a proper case, be material in considering the question of laches; but to declare the Wilson Coal Company a bona fide purchaser of this property because of the stock transfers shown here would be to announce a principle not sustained by any authority cited, and, in my opinion, not supported by any good reason.

I therefore conclude that complainants are entitled to a decree canceling the patent.