**Harry PAISNER and Samuel Paisner, copartners, doing business under the firm name and style of Quality Manufacturing Co.,**

v.

**The UNITED STATES.**

**No. 556–53.**

United States Court of Claims.

May 8, 1957.

Harry Rosenblatt, New York City, for plaintiff.

Alfred J. Kovell, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

During World War II the plaintiffs, then trading as a partnership under the name of Westchester Hats, committed certain violations of the Walsh-Healey Public Contracts Act (49 Stat. 2036 et seq., 41 U.S.C.A. § 35 et seq.) in the performance of their Government contracts. Eventually, after investigation, hearings, and a report and recommendations by the trial examiner of the Department of Labor, the Secretary of Labor, on April 24, 1950, made findings and a decision that plaintiffs were guilty of the violations as charged.

Section 3 of the Walsh-Healey Act (41 U.S.C.A. § 37), after directing the Comptroller General to distribute a list to all Government agencies of all persons or firms found by the Secretary of

Labor to have violated the Act, provides as follows:

"\* \* \* Unless the Secretary of Labor otherwise recommends no contracts shall be awarded to such persons or firms or to any firm, corporation, partnership, or association in which such persons or firms have a controlling interest until three years have elapsed from the date the Secretary of Labor determines such breach to have occurred."

The Secretary of Labor made no recommendation of leniency as to the plaintiffs and so for a period of three years from April 24, 1950, they were ineligible to receive Government contracts.

In the meantime the plaintiffs in 1946 changed their partnership name to Quality Manufacturing Company. In 1950 and again in 1951 plaintiffs, trading as Quality Manufacturing Company, obtained two contracts from the defendant for the manufacture of field caps while they were still on the list of debarred bidders. These contracts were fully performed and plaintiffs were paid the contract price of $181,580.46.

In December 1951 a third contract calling for the manufacture of 50,000 sleeping bags, was awarded to Quality Manufacturing Company on a bid form which was signed by Harry Paisner, partner, and clearly indicated Quality to be a partnership. The plaintiffs commenced performance under this contract. On March 18, 1952, the Government issued a stop order, later confirmed by its letter to plaintiffs of April 10, 1952, which canceled the contract as void *ab initio* because it had been discovered that the plaintiffs were debarred from receiving Government contracts.

Before awarding this last contract to plaintiffs, the defendant's contracting officer had made a routine examination of the list of debarred contractors which his office maintained in current condition, but had through error failed to find plaintiffs' names there. The apparent reason for this error was that, while the list in question carried the names of Harry Paisner, Samuel Paisner, and Westchester Hats (the names under which the Department of Labor had prosecuted plaintiffs and which had been circularized by the Comptroller General to the procurement agencies), it did not include the name of the Quality Manufacturing Company.

By the time plaintiffs received the stop order of March 18, 1952, they had already cut material sufficient for 11,000 sleeping bags and, after inquiry, were instructed by the Government inspector to suspend further cutting but to finish the assembly of the parts already cut. Plaintiffs actually delivered a total of 12,106 sleeping bags, which the Government accepted. Thus, they cut material for 1,106 units after receiving clear instructions to discontinue cutting. On May 8, 1952, prior to the last shipment of 3,106 completed units on May 16, the Secretary of Labor removed plaintiffs from the debarred list, so that from May 8 on they resumed their capacity as eligible contractors.

The Government refused to pay plaintiffs for the delivered and accepted sleeping bags, and plaintiffs are suing to recover not only the contract price of the completed and accepted units, but also the loss of profits on the balance of the contract which the defendant's stop order prevented them from completing.

Subsequently the defendant relet the balance of the contract to another contractor, and incurred a cost of $896 in removing from plaintiffs' plant the remaining Government-furnished material which had not been cut. In its first counterclaim the defendant asks a judgment in that amount. In its second counterclaim the defendant asks for a judgment of $181,580.46, the amount paid plaintiffs for full performance of the two earlier contracts referred to above.

The adjudication of the plaintiffs' claims and the Government's counterclaims presents the delicate question of conserving the purpose and policy of an important public statute without inflicting upon the violator of the statute dis-

proportionate and unduly harsh economic punishment.

Congress, in section 3 of the Walsh-Healey Act, the pertinent part of which is quoted, *supra*, herein, did not state what should be the consequences, if contracts were in fact awarded to and performed by persons to whom, the statute says, "no contracts shall be awarded." It was, no doubt, supposed that the provisions would be self-enforcing, since the Government's contracting agents could readily be furnished the names of the relatively small numbers of adjudged violators. In these circumstances, we can only surmise how severely Congress would have desired that such persons should be treated.

Section 2 of the Walsh-Healey Act (41 U.S.C.A. § 36), provides for the penalties which a direct violator of the act shall suffer. He is penalized $10 per day per person for knowingly working persons who are under age, or for working convict labor, and is required to pay to the Government, for the benefit of the workmen, the amount of any improper deductions, rebates, or refunds, and of any underpayment of wages. The Government is given the right to cancel the contract and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original contractor.

These relatively mild provisions, all of them except the $10 per day provision being merely compensatory and not punitive, are what Congress imposed upon the substantive violator of the Walsh-Healey Act. The provision about canceling the contract and charging the violator with the excess costs of substitute performance seems to negative any idea that the contractor is to forfeit the right to be paid for what performance he has accomplished before cancellation, or is to be required to pay back what he has received for completed performance.

We think that Congress, dealing so mildly with violators of the act at the time of the violation, cannot be regarded as having intended to deal infinitely more harshly with former violators who have already paid the penalties expressly provided by the statute, and have committed no new violations.

The former violator can be made eligible for new contracts by the simple direction of the Secretary of Labor that his name should be taken off the ineligible list. Congress has prescribed no conditions for this action of the Secretary, leaving it solely in his discretion. In the instant case, on February 5, 1952, while the plaintiffs were in the midst of performing the sleeping-bag contract, for which they were, of course, ineligible, the plaintiffs petitioned the Secretary to remove them from the ineligible list. In their petition they stated that they were "scrupulously and with strict attention to the minutest detail" observing the labor standards prescribed by the Walsh-Healey Act and all Federal, State and municipal laws. The Secretary might well have wondered how they were complying with the Walsh-Healey Act when they were, and for almost two years had been ineligible to receive Government contracts. In April, their sleeping-bag contract was canceled by the contracting officer because of their ineligibility. However, the Government's inspector told the plaintiffs to finish assembling the work which was already cut, and the plaintiffs did this. On May 8, the Secretary removed their names from the ineligible list. Not until May 16 did the plaintiffs ship, and the Government accept, the last of the sleeping bags which the plaintiffs manufactured under the contract.

We suppose that the Secretary, having apparently uncontrolled discretion as to putting contractors on and taking them off the ineligible list, would have the power to take them off the list *nunc pro tunc*. It may be that the Secretary intended to do that in this case. On the other hand it may be that in spite of the almost express notice in the plaintiffs' petition to the Secretary that they were engaged in the performance of a Government contract, he may have been

unaware of it and may have had no intention to make his action retroactive.

The plaintiffs' bidding for and acceptance of the contracts on which their suit is based, and the earlier contracts on which the second count of the Government's counterclaim is based, was deceptive and reprehensible. It was also reckless and foolhardy. They, by making these contracts and spending their money in performing them, exposed themselves to almost unlimited financial risks. The extent of those risks is evidenced by the fact that Commissioner Bernhardt of this court, after a careful and thoughtful consideration of the facts and the legal precedents, felt compelled to the conclusion that they had forfeited all right to be paid for 9,000 of the sleeping bags which they manufactured, though the reasonable value of their work was $8,901, and in addition had forfeited all right to retain $181,580.46, which had been paid them as the contract price and, apparently, the reasonable value of the work which they had done on former contracts.

The cases in which courts have considered problems comparable to our problem are legion. The decisions are not all consistent with each other. With variations in emphasis in one direction or the other, the decisions demonstrate, as one would expect, an effort on the part of the courts to uphold the purpose and policy of the applicable law, and at the same time refrain from unnecessarily vindictive treatment of the violator. If there is a way of achieving both of those desirable ends in this case, we should follow that way. We should not, in effect, fine the plaintiffs $190,000 for conduct for which we are by no means certain that Congress meant that they should be penalized at all.

The purpose of the plaintiffs in bidding for and accepting the contracts for which they were ineligible was, of course, to make a profit. If the hope of making, or of retaining, a profit from such conduct is removed, the policy of the Walsh-Healey Act is conserved, and no person in his right mind, no matter how unscrupulous he may be, will take a contract under those conditions. Applying that doctrine in this case, the plaintiffs are entitled to recover $10,532.21, which represents the contract price of $11,972.83 for the 12,106 sleeping bags which they completed and delivered, less $1,440.62, which was their profit on the units delivered. The Government is entitled to recover on the first count of its counterclaim the $896 which it spent in delivering to and removing from the plaintiffs' plant those materials which the plaintiffs were not permitted to manufacture. On the second count of its counterclaim the Government is entitled to recover $21,789.-66, which was the plaintiffs' profit on the two contracts for which it was paid $181,580.46.

The defendant is entitled to a judgment against the plaintiffs for $12,153.-45.

It is so ordered.

JONES, Chief Judge, and LARAMORE and LITTLETON, Judges, concur.

WHITAKER, Judge (dissenting).

The Walsh-Healey Act provides no penalty against an ineligible contractor who enters into a contract with defendant. It is true plaintiffs failed to reveal, even concealed, their identity as ineligible contractors, and contracted with full knowledge of their ineligibility. In so doing, they perpetrated a fraud against the United States, in that they, by deceit and trickery, circumvented the purpose of the Act. But, no statute provides for recovery by the Government of a contractor's profit, as a penalty therefor. How can we allow recovery where there is no statutory or contractual authority therefor?

Under the common law, fraud vitiated the contract and allowed, in the absence of any equitable considerations at least, recovery of actual damages sustained as a result of the fraud; but it is not shown that the defendant suffered any monetary damage, except $896, the cost of furnishing plaintiffs with material and remov-

ing it from plaintiffs' premises after termination.

The common law did not permit recovery of money paid on a contract induced by fraud, unless actual monetary damage was sustained as a result of the fraud. On the other hand, to annul a transaction fraudulently induced, the party seeking relief therefrom was obliged to return the consideration received thereunder. See Causey v. United States, 240 U.S. 399, 36 S.Ct. 365, 60 L.Ed. 711, and many other cases.

So much for the two contracts fully performed, and paid for.

However, I think that under the forfeiture statute (28 U.S.C. § 2514), plaintiffs' claim for the amount unpaid on the terminated contract may be forfeited, because plaintiffs' claim is tainted with the fraud they perpetrated in securing the contract. Except for the fraud there would have been no contract and no claim.

It is not necessary that the Government should have suffered monetary damage. The criminal statutes provide (18 U.S.C. § 88) that where there has been a conspiracy to violate an Act of Congress, the conspirators may not escape liability because the United States has not suffered any pecuniary loss. The fact that the lawful function of the Government has been impaired or defeated, or that the United States has been defrauded in any manner, whether pecuniary loss has been suffered or not, is sufficient for conviction. Hyde v. Shine, 199 U.S. 62, 25 S.Ct. 760, 50 L. Ed. 90; Dimond v. Shine, 199 U.S. 88, 25 S.Ct. 766, 50 L.Ed. 99; Haas v. Henkel, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569; Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

Plaintiffs, Harry Paisner and Samuel Paisner, were undoubtedly guilty of a conspiracy to defraud the Government, using the word "fraud" in this sense, when, by concealing their identity they induced the Government to award them this contract in violation of the Walsh-Healey Act. Hence, I think it is our duty to declare forfeited the amount due them under the terminated contract.

The Commissioner in his opinion has cited a number of cases where the plaintiffs have been denied recovery where the contract has been entered into illegally or the indebtedness has been incurred illegally. They are: United States v. Trinidad Coal & Coking Co., 137 U.S. 160, 11 S.Ct. 57, 34 L.Ed. 640; Causey v. United States, supra; Sutton v. United States, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099; Pan American Petroleum & Transport Co. v. United States, 273 U.S. 456, 47 S.Ct. 416, 71 L.Ed. 734; Atlantic Contracting Co. v. United States, 57 Ct.Cl. 185; Rankin v. United States, 98 Ct.Cl. 357.

I do not think the plaintiffs can recover the amount unpaid on the terminated contract, notwithstanding the fact that a Government agent ordered plaintiffs to complete the sleeping bags the materials for which had already been cut. The facts were similar in Sutton v. United States, supra, where recovery was denied; but I do not think the Government may recover amounts already paid on a contract fully performed. 28 U.S. C. § 2514 does not authorize affirmative action by the United States to recover amounts already paid under a contract entered into in violation of the law.

I would deny plaintiffs recovery and allow defendant to recover $896, the cost of furnishing and removing material from plaintiffs' premises.