**W.F. MAGANN CORPORATION, a Virginia corporation, Plaintiff,**

v.

**DIAMOND MANUFACTURING COMPANY, INC., d/b/a Marine Constructors, a Georgia corporation, and Aetna Casualty and Surety Company, a Connecticut corporation, Defendants.**

Civ. A. No. 81–1149–1.

United States District Court,
D. South Carolina,
Charleston Division.

Feb. 22, 1984.

G. Dana Sinkler, Charleston, S.C., Edgar
H. MacKinlay, Norfolk, Va., for plaintiff.

A. Camden Lewis, Columbia, S.C., Don-
ald E. Austin, William H. Moore, Jr., Sa-
vannah, Ga., M. Dawes Cooke, Charleston,
S.C., M. Tyrus Butler, Jr., and Frank W.
Seiler, Savannah, Ga., for defendants.

ORDER AND JUDGMENT

HAWKINS, District Judge.

This case, heard by the court without a
jury during its July 1983 term in Charles-
ton, South Carolina, arose as a result of a
dispute between the primary contractor on
the Corps of Engineers Murrell's Inlet
Navigation Project ("Project"), W.F. Ma-
gann Corporation ("Magann"), and the
dredging subcontractor, Diamond Manufac-
turing Company, Inc. ("Diamond"). Ma-
gann brought this action against Diamond
and its surety, Aetna Casualty and Surety
Company ("Aetna"), alleging breach of the
subcontract. Diamond, in three counter-
claims against Magann and in a counter-
claim and cross-claim against Magann and
Aetna in *quantum meruit* under the Miller
Act, 40 U.S.C. §§ 270a–270d, alleges defec-
tive specifications, changed conditions, dif-
fering site conditions, improper application
of specifications, and impossibility, all
amounting to a breach of the subcontract.

Having heard the testimony, having
studied the exhibits, and having reviewed
all the evidence, the court makes the fol-
lowing findings of fact and conclusions of
law.

FINDINGS OF FACT

A. BACKGROUND

On September 2, 1977, Magann entered
into a contract with the United States
Army Corps of Engineers ("Corps") for
construction of a channel and jetty system
to provide a navigable entrance to Mur-
rell's Inlet from the Atlantic Ocean. The
Project consisted of the construction of
stone jetties seaward of the Inlet and the
dredging of channels and a deposition basin
in and about the Inlet.

The contract between Magann and the
Corps provided that it was to be performed
in accordance with the General Provisions
and Specifications DACW 60–77–B–0014,
dated 14 June 1977, as amended.

The "General Provisions" and the "Speci-
fications" are set forth in a document enti-
tled "Specifications for Construction of

Channel and Jetty System, Murrell's Inlet Navigation Project, Murrell's Inlet, South Carolina."

Subsequently, by instrument dated October 19, 1977, Magann entered into a subcontract with Diamond whereby Diamond agreed to perform "[a]ll dredging work required by Specifications ..." according to varying unit prices for various aspects of the dredging.

The Subcontract further provided that payment to Diamond by Magann should be expressly subject to the provisions of Article 7—"Payments to the Contractor" of the General Provisions of the Construction Contract and to Paragraphs 1–9 "Payments" and 1–10 "Payments for Mobilization and Demobilization" of the Specifications—Special Provisions of the Construction Contract.

It also provided that payment should be made on the basis of written requisitions from Diamond "as approved by [Magann] *and to the extent that payment therefor has been received by [Magann] from [The Corps]* ...." (Emphasis added.)

Diamond assumed full responsibility for site conditions that might impact the dredging work. Section 5(d) of the Subcontract provides:

PERFORMANCE REQUIREMENTS:

Site Inspection and Conditions: [*Diamond*] acknowledges and *accepts the sole responsibility for unanticipated costs* which may result from the nature and location of work and the general and local conditions; those conditions affecting transportation, access, disposal, handling and storage of materials; availability and quality of labor; availability of water and electric power; availability and condition of roads, climatic conditions and seasons; *river and ocean hydrology, river stages and ocean tides;*

physical conditions at the work-sites and the Project area as a whole; *topography and ground surface conditions; nature and quantity of surface materials to be encountered;* subsurface conditions, if such subsurface conditions would reasonably be expected to be a part of Subcontractor's Work; *equipment and facilities needed preliminary to and during performance of the Subcontract;* and all other matters which can in any way affect performance of the Subcontract, or the cost associated with such performance. Failure of Subcontractor to acquaint itself with any applicable condition will not relieve it from the responsibility for the difficulties or the costs of successfully performing the Subcontract. (Emphasis added.)

It further provides under *Part I, Special Provisions:*

(c) *Additionally, [Diamond] shall fully comply with all other applicable provisions, terms and conditions of the Specifications,* including without limitation the Construction Contract, the General Provisions (Construction Contract), the General Requirements and the Technical Provisions. (Emphasis added.)

The dredging work required by the Specifications is described in Part VII of the Technical Provisions of the Specifications and in amended paragraphs 4–4, 4–22, 4–22.1 and 4–22.2 of Part IV of the Technical Provisions.

Under Part VII of the Technical Provisions of the Specifications, the method of payment for dredging is set forth in detail:

7–9. ESTIMATED QUANTITIES. The total estimated quantity or quantities of material necessary to be removed from within the specified limits to complete the work are as follows:

| Reach | Net Depth Feet MLW | Net Depth C.Y.Pl.Meas. | Overdepth 2 Ft. C.Y.Pl.Meas. | Total C.Y. Pl.Meas. |
|---|---|---|---|---|
| Entrance Channel * | −10 | 213,000 | 79,000 | 292,300 |
| Auxiliary Channel | −10 | 74,000 | 18,000 | 92,000 |
| Deposition Basin | −18 | 552,000 | 48,000 | 600,000 |
| Inner Channel "A" | −10 | 187,000 | 39,800 | 226,800 |
| Inner Channel "B" | − 8 | 4,250 | 18,750 | 23,000 |
| TOTAL | | 1,030,250 | 203,550 | 1,234,100 |

\* Includes Pilot Channel Excavation

7–9.1. The quantities shown above are computed from the latest survey as reflected on the contract drawings. They have not been increased to allow for shoaling because of the unpredictable shoaling pattern.

7–9.2. Within the limit of available funds, the Contractor will be required to excavate the entire quantity of material necessary to complete the work specified herein, be it more or less than the amounts above estimated, all work to be done in accordance with the contract at the contract price or prices, except as may be affected by Variations in Estimated Quantities, paragraph 1–12.

7–10.1. OVERDEPTH. To cover inaccuracies of the dredging process, material actually removed from within the specific areas to be dredged to a depth of not more than two feet below the required depth will be *estimated and paid for* at the contract price.

7–11. SIDE SLOPES. *Material actually removed, within limits,* approved by the Contracting Officer, *to provide for final side slopes no flatter than one vertical on four horizontal,* but not in excess of the amount originally lying above this limiting side slope *will be estimated and paid for,* whether dredged in original position or by dredging space below the pay slope plane at the bottom of the slope for upslope material capable of falling into the cut. In computing the limiting amount of side slope dredging, an overdepth of two feet measured vertically will be used.

\* \* \* \* \* \*

7–15. MEASUREMENT AND PAYMENT. The total amount of material

removed and to be paid for under this contract will be measured by the cubic yard in place by computing the value between the bottom surface shown by soundings of the last survey made before dredging and the bottom surface shown by the soundings of a survey made as soon as practicable after the entire work specified within an acceptance section (paragraph 1–19.1) has been completed and *included within the limits of the overdepth and side slopes described in paragraphs 7–9 through 7–11,* less any deductions that may be otherwise required by these specifications.

7–15.1. ... *Determination of quantities and the deductions made therefrom to determine quantities by place measurement to be paid in the area specified after having once been made, will not be reopened except on evidence of collusion, fraud, or obvious error.*

7–15.2. *All initial and final sounding surveys shall be performed by [The Corps]* and all expenses incurred therefrom shall be borne by [The Corps] except as otherwise specified in paragraph 1–19. The soundings in the Murrells Inlet Channels will be taken with a Bludworth ES–130SS Fathometer operating on a frequency band of 198 to 202 kHz
. . . .

7–15.3. *Monthly partial payments will be based on approximate quantities estimated by the inspector.*

Part IV of the Technical Provisions of the Specifications, Section 4–4, as amended, provides:

4–4. ORDER OF WORK. JETTY CONSTRUCTION. Construction shall

proceed as follows unless otherwise approved by the Contracting Officer.

(1) North Jetty

(2) Pilot Channel

(3) Initiate construction on south sand dike with Pilot Channel excavation and borrow from Auxiliary Channel and Inner Channel A, as required (see paragraph 7–2)

(4) South Jetty

(5) Final Dredging.

7–2. ORDER OF WORK. Final channel dredging operations shall not be initiated until construction of the stone structures of both the north and south jetties have been completed. Items of final channel dredging will proceed as follows:

(1) Entrance Channel Dredging

(2) Auxiliary Channel Dredging

(3) Deposition Basin Dredging

Inner Channel "A" final dredging and Inner Channel "B" final dredging may be accomplished concurrent with the above-listed final dredging items. Blasting will not be permitted.

Dredging was to be in three phrases as follows:

(1) Phase I—Pilot Channel

(2) Phase II—Maintenance Dredging

(3) Phase III—Final Channel Dredging

The Project was exhaustively studied by the government prior to asking for bids. The studies were incorporated into a General Design Memorandum in accordance with applicable provisions of ER 1110–2–1150, dated 1 October 1971, as reduced through Change No. 7, 22 July 1979. Due to the nature of the Project, the reduced Design Memorandum was the basis for the preparation of the Plans and Specifications for the Project. The Design Memorandum was distributed in accordance with a control list for copies, and was not included in the bid package nor otherwise brought to the attention of prospective bidders on the Project.

In addition, an extensive Hydraulic Model Study of the Project was conducted at the Corps' Waterway Experiment Station at Vicksburg, Mississippi, resulting in a Hydraulic Model Study Report which was available in the offices of the Charleston District but was not included in the bid package nor brought to the attention of prospective bidders on the Project.

The Design Memorandum is quoted in part as follows:

28. *Non-structural controls.* Construction and maintenance of the required channel were considered using a program of dredging in lieu of structural controls. In February 1975, private dredging contractors were contacted by Charleston District and asked if they would consider dredging in Murrells Inlet with a pipeline dredge. All contractors responded that dredging in Murrells Inlet was too hazardous and not feasible for a pipeline dredge. The contractors provided the following reasons for not dredging with a pipeline dredge: insurance is void once they go in open ocean waters; the only access to Murrells Inlet from the intra-coastal waterway is at Georgetown or Little River Inlet (also an unstable, shallow inlet), which would require the dredge to be towed in the open sea for about 50 miles; a large dredge would require from 6 to 8 feet of water in which to work and would be unable to seek refuge inside Murrells Inlet during stormy weather by the shallow depths; a small portable dredge would not require the water depths that a large dredge would but a small dredge's pumping capacity would render its operation useless due to rapid shifting of sand in the inlet; and the design of a pipeline dredge renders it useless in areas of strong wave actions (ladder fixed to dredge thereby transferring all the force of cutterhead hitting bottom during heavy seas to dredge superstructure).

29. In September, 1975, a private consulting engineering firm was employed by Georgetown County to prepare plans and specifications to perform pipeline dredging at Murrells Inlet. The funds for this dredging was to be obtained from the Coastal Plains Regional Com-

mission. A large number of private dredging firms were contacted by the private engineering firm. These dredging companies were requested to signify their interest in undertaking a dredging operation in Murrells Inlet. The response to this inquiry was the same as received earlier by the district office; no interest in this work. Two out-of-state dredging firms actually sent representatives to look at the area, and then decided that the work could not be done with their equipment.

31. The technology does not presently exist in the private or government dredging fleets to adequately maintain Murrells Inlet. The Corps of Engineers is not authorized to construct new dredges that could have capability of dredging Murrells Inlet; and the private sector appears not to be interested in undertaking the design of a prototype dredge capable of this operation without Federal funds. For the reasons stated in this and preceding paragraphs, dredging without structural controls is considered to be uneconomical and physically infeasible.

32. Dredging without structural controls also does not provide the following beneficial purposes of a jetty system: wave attentuation to provide hazard free navigation; training device to control channel alignment; current constraint to eliminate cross-currents; and exclusion of littoral drift from the channel. The inability of maintaining a channel without structural controls to exclude the littoral drift from the channel further aggravates the dredging problems. Littoral drift begins to move into the dredged channel as soon as the dredge makes its pass. Based on present dredging technology and the inability of dredging only to provide the benefits of a jetty system, a dredging only scheme for Murrells Inlet is not considered to be viable alternate solution to the recommended solution (dredging with structural controls).

128. *Entrance channel.* The entrance channel will extend from the −10 feet ocean contour to a point without the jetties, a length of 3,000 feet. The entrance channel will be 300 feet wide and 12 feet deep. An allowable overdepth of 2 feet will be permittrd to compensate for dredging inaccuracies. An additiona overdepth of 2 feet to facilitate future maintenance in areas of hard bottom material will not be required. While beach sands are known to compact very hard due to the vibratory action of the surf, it is believed that any shoal material (littoral drift) would also compact just as hard. The compaction of the shoal material to the same degree as the in situ material would negate any possible benefits from advance maintenance overdepth. Side slopes of 1 vertical on 4 horizontal are expected initially after the box-cut dredging of the channel. Due to the wave action in the entrance channel, the ultimate side slope will probably be 1 vertical on 10 horizontal. The distance between the edge of the channel and the jetty toe are sufficient to allow the ultimate side slope of 1 vertical on 10 horizontal.

The Project started off in normal fashion. By letter dated July 20, 1978, Magann submitted a copy of Diamond Manufacturing Company's Plan of Operation for the Project. Diamond's Plan of Operation was approved by the Corps with written approval given on October 16, 1978. The approved Plan was as follows:

Our Plan of operation for the initial dredging at Murrell's Inlet is as follows:

(1) Move dredge and related equipment on job-August 24-September 10, 1978.

(2) Lay a submerged pipe line under existing channel and lay shore line to the south end of the south sand dike.

(3) Begin dredging pilot channel at inshore end station 10–15 advancing seaward and building south sand dike from the south end advancing northerly, thereby keeping the discharge as far as possible from the existing channel until the new pilot channel is completed.

(4) Dredge borrow material from the auxiliary channel and inner channel "A"

as required to build the south sand dike to a sufficient section to allow access for jetty construction.

(5) Demobilize dredge and equipment until final dredging can be accomplished or until the maintenance dredging become [sic] necessary.

It is our understanding that all shoaling that takes place in the dredged areas will be paid for in accordance with the unit price schedule for the final dredging.

This Order of Work was altered at the request of Diamond and initial dredging was commenced at the west end of the Auxiliary Channel on September 20, 1978, prior to completion of the North Jetty. At the request of Magann, the Corps also allowed construction of the South Sand Dike to full section during the initial dredging. Almost immediately, problems arose with respect to the dredging.

Copies of the Contract between Magann and the Corps, Specifications for Construction of Channel and Jetty System, Murrell's Inlet Navigation Project, Murrell's Inlet, South Carolina, the Subcontract between Magann and Diamond, the General Design Memorandum and the Hydraulic Model Study Report, all have been filed with the Clerk of this court and are hereby made a part of this order.

## B. DREDGING

Based on the testimony of the Corps' inspector, I find that the side slope began falling and shoaling was extensive as early as September 28, 1978. The dredge superintendent, Captain John Barker, testified that the shoaling was almost immediate. Captain C.W. Phillips, the dredge superintendent who replaced Captain Barber, adamantly testified concerning the problem of the sand falling into the dredged channel. As evidenced by a letter dated December 11, 1978, Diamond's Vice-President in charge of the Murrell's Inlet Project, Earl Haden, formally advised Magann that "it was necessary to dredge considerable more yardage from the pilot channels than the quantity for which we were paid" and that the increased dredging "was brought about

by rapid shoaling and also by natural lowering of the side slopes which far exceeded the 1 to 4 allowed for payment."

The Corps was put on notice of Diamond's claim for changed conditions on that same date as evidenced by Magann's correspondence of December 11, 1978. I find that the problem with extensive shoaling and bank failure continued throughout Phase I and Phase II.

The Specifications for the Murrell's Inlet Navigation Project represented the dredging work to be standard and typical; however, I find that the Specifications misclassified the sand as being a material that would hold the specified 4 on 1 slopes. The sand was of a less stable nature and was susceptible to erosion with currents as low as .8 feet per second. Dr. Greg Richardson, a Ph.D. Geotechnical Engineer, testified that the subject sand was SP sand having very little fines to act as a bonding agent; that Murrell's Inlet is a tidal lagoon with no opportunity for silts and clays to reach it and is, thus, almost pure sand; and that the material at Murrell's Inlet was the most sensitive to current velocities and had a high erosion capacity.

I find that in misclassifying the sand, the Specifications continued to portray this as a typical dredging project when it was not. There was no reference in the Specifications to the warnings contained in the Design Memorandum.

In Specification 7-11, the side slopes were to "be no flatter than one vertical on four horizontal." The Specifications precluded the dredger from being able to compensate for excessive shoaling and slope failure if such were known, whereas shoaling and failing side slopes during this interim would, of course, have a tremendous impact on the surveys and the resulting measurement of material excavated. Specification 7-12.1 provided that "excessive dredging shall not exceed one (1) foot." Mr. John Romanosky ("Romanosky"), the Contracting Officer's authorized representative on the Project, testified that all bidders were entitled to rely on a 4 on 1 slope

holding, and it is clear that the Specifications represented to all bidders that the channel slopes were to be 4 on 1 and, further, that such slopes would hold. Romanosky testified that the Corps held Diamond to that requirement.

The matter of payment was also based upon the slopes holding and no excessive shoaling. Specification 7–10 allowed for and paid for two feet of overdepth to "cover the inaccuracies of the dredging process."

The Specifications are unclear on acceptance sections. An acceptance section is that distance a dredger must dredge between before surveys and after surveys. During Pilot Channel dredging, the Corps used the acceptance sections provided for final dredging, and these ranged up to 3000 feet. The time between before survey and after survey was at least twenty days.

Romanosky repeatedly advised that payment would not be made for any yardage outside the specified dimensions of the channels, plus the allowable overdepth. The Specifications envisioned, and the Corps applied a payment program totally dependent upon, minimum shoaling and no side slope failure.

I find that there was immediate and excessive shoaling and side slope failure throughout Phase I just as predicted by the Corps' Design Memorandum and that this excessive shoaling and failing slopes caused the before and after survey technique of measuring excavated sand to be inadequate. I find that Diamond demanded that another technique be used because of the dynamics of the area and the material involved.

Captain Phillips asked that payment be based upon hours pumped. Captain Barber surveyed the sand in place on the South Sand Dike and found that Diamond had dredged 348,746 cubic yards of sand during September and October of 1978. The Corps' before and after surveys show only 204,613 cubic yards. Diamond invoiced Magann for 348,746 cubic yards. The Corps reduced this to 204,616 cubic yards and informed Magann that it would pay

Diamond in accordance with its before and after survey figures. This resulted in Diamond being paid $199,675 instead of the $407,128 invoiced.

Dr. Richardson, by taking borings and measurements, estimated that during Phase I Diamond excavated between 629,-300 and 737,200 cubic yards of material. The Corps paid for only 349,584 cubic yards. In arriving at these figures, there was great disparity in the testimony concerning run off and erosion on the South Sand Dike. Romanosky would admit to no erosion or run off when building this dike; in an industry survey by Magann, other dredgers estimated a 15% to 40% run off, and Dr. Richardson, through his borings and measurements, arrived at 40% run off. The South Sand Dike was built by pumping sand into the existing navigational channel with current velocities in excess of three feet per second. This court is of the opinion that there was appreciable erosion or run off and that the measurement technique used did not adequately measure the sand excavated by Diamond.

Based on the testimony of Bill Magann, I find that Magann and the Corps refused to accept any measurement technique other than before and after surveys, although Mr. Magann admitted that this was an impossible task inasmuch as Diamond had no way to make these surveys after the fact. I find that the evidence clearly shows that Diamond excavated substantially more material than for which it was paid.

Phase II, Maintenance Dredging, followed Phase I, and by all accounts was marked by long acceptance sections and long dredge walks for relatively little material. This phase called for the clearing of the Pilot Channel as opposed to the new cuts of Phase I.

Phase III was the final dredging of all channels. The Specifications clearly provided that "[F]inal channel dredging operations *shall not* be initiated until construction of stone structures of both the north and south jetties have been completed." (Emphasis added.)

## C. SOUTH SAND DIKE

I find that the Plans and Specifications called for the construction on South Sand Dike with Pilot Channel excavation and borrow from Auxiliary Channel and Inner Channel A, as required, to begin after construction of the North Jetty and the dredging of the Pilot Channel; that Diamond's Plan of Operation set out the order in which the South Sand Dike would be constructed, and that on August 28, 1978, Magann, with the acquiescence of Diamond, requested a change in the order of dredging so as to bring the South Sand Dike to full section; and that this was approved by the Corps. The Corps letter of August 28, 1978, specifically stated that the Pilot Channel could not be wider than ninety feet. This change order forced Diamond to dredge more material than was available in the ninety-foot Pilot Channel. Diamond was permitted to get borrow material as needed, and this it did from the Auxiliary Channel.

## D. DEPOSITION BASIN

During February 1980, Magann notified Diamond that the Deposition Basin had been cut from 600,000 cubic yards to 300,000 cubic yards. Due to the large amount of dredging done by Diamond in Phase I, areas close to the Basin where sand could be deposited were being rapidly filled; and with the equipment Diamond had, it would have been impossible to dredge the Basin without a booster pump. With the reduction in the amount of sand to be dredged, however, Diamond's equipment was sufficient to dredge the Basin, and the areas close to the Basin could accept the 300,000 cubic yards where it could not accept the 600,000 cubic yards. However, in May 1980, the Corps decided that 600,000 cubic yards had to be removed from the Basin.

Although at the beginning of the Project no mention was made of, and there was no requirement for, a booster pump, because the excessive dredging had caused the adjacent spoilage areas to be filled, it was necessary to acquire a booster pump to move the sand to a more distant location.

The dredge being used was unable to pump the sand the necessary distance without the additional pump. Diamond was unable to purchase a booster pump which resulted in it building such a pump at the cost of $250,000 and having it taken to Georgetown, South Carolina.

The Specifications did not require a booster pump or any additional plan, but Magann and the Corps would not permit Diamond to start dredging the Basin without the booster pump and without a new Plan of Operation.

In addition, Diamond was also concerned about rocks falling from the jetty into the Basin, a problem recognized by Magann and the Corps.

Diamond had been making claims for payment for work it had performed, and Austin, the president of Diamond, testified that Magann told him he would not be permitted to dredge the Basin unless the claims were dropped and a specified sum of money was accepted for the work that had been performed for which Diamond had not been paid. Diamond claims that the construction of the pump, which was required to dredge the Deposition Basin, delayed the timely completion of the job. Diamond refused to proceed with the dredging of the Basin until it was assured that its pending claim for payment for additional yards was acted upon.

Merritt Construction Company dredged the Deposition Basin at a cost of forty cents more per cubic yard than called for by the Contract. The dredging of the Basin would have been the easiest part of the Project.

## E. PERFORMANCE AS CONTEMPLATED BY SUB–CONTRACT

Diamond was to perform all the dredging required by the Contract.

Diamond was to submit a Plan of Operation, which it did; and Magann submitted this Plan to the Corps, which approved it on October 16, 1978. [See page 1305 herein.]

Diamond was to perform the Order of Work in accordance with the Plans and Specifications. [See 4–4 and 7–2, page 1303 herein.]

Diamond was to receive payment based on a before and after dredging survey.

Diamond was to make a written request for payment to Magann, and Magann was to approve the request and pay Diamond upon its receipt of payment from the Corps.

Diamond was to have full responsibility for site conditions that might impact the dredging work. [See "Performance Requirements," page 1302 herein.]

The method by which Diamond was to be paid was set out in detail in Part VII, "Technical Provisions." [See 7–9 through 7–15.3, pages 1302, 1303 and 1304 herein.]

The Contract anticipated defective Specifications and differing site conditions and made provisions for them as follows:

Available remedial measures for defects in the Specifications and differing site conditions are addressed under Sections 3, 4 and 6 of the General Provisions of the Construction Contract.

### 3. CHANGES (1968 FEB)

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any order, an equitable adjustment shall be made and the contract modified in writing accordingly: Provided, however, That except for claims based on defective specifications, no claim for any change under (b) above shall be allowed for any costs incurred more than 20 days before the Contractor gives written notice as therein required; And provided further, That *in the case of defective specifications for which [The Corps] is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with such defective specifications.*

### 4. DIFFERING SITE CONDITIONS (1968 FEB)

(a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. *The Contracting Officer shall promptly investigate* the conditions, and if he finds that such conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed as a result of such conditions, an equitable adjustment shall be made and the contract modified in writing accordingly. (Emphasis added.)

In the event of disagreement regarding the existence of a defect in the specifications or a type 1 or type 2 differing site condition, paragraph 6 of the General Provisions of the Contract provides:

### 6. DISPUTES (1964 JUN)

(a) Except as otherwise provided in this contract, *any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer,* who shall reduce the decision to writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Contracting Officer shall be final and conclusive unless, within 30 days from the date of receipt of such copy, the Contractor mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the head of the agency or his duly authorized representative for the determination of such appeals shall be final and conclusive. *This provision shall not be pleaded in any suit involving a question of fact arising under this contract as limiting judicial review of any such decision to*

*cases where fraud by such official or his representative or board is alleged: Provided, however, that any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith or is not supported by substantial evidence.* In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of his appeal. *Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.*

(b) This "Disputes" clause does not preclude consideration of questions of law in connection with decisions provided for in paragraph (a) above. Nothing in this contract, however, shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

## F. DIAMOND'S TERMINATION

On August 28, 1978, Magann submitted a request for a change in the order of dredging so as to bring the South Sand Dike to full section, and this was approved by the Corps. Almost immediately problems arose with respect to the dredging. The side slopes began falling and shoaling was extensive. Because of the inadequate measurement technique being used, Diamond was dredging more materials than for which it was being paid. Diamond requested that a different method of measurement be used for payment purposes, but Magann and the Corps refused the request. Diamond continued to make claims for materials that had been dredged. All materials dredged were used to either build dikes or nourish beach areas. The Corps reduced the amount of materials to be dredged from the Deposition Basin from 600,000 cubic yards to 300,000 cubic yards, and then increased it back to the original 600,000 cubic-yard requirement. Diamond was unable to meet this requirement with

the equipment it had on the project and immediately started construction of a booster pump. At this time, the Corps made additional requirements on Diamond which included a requirement for a new Plan of Operation to include extensive engineering data with regard to the booster pump and pipe. Diamond was concerned with falling rocks, and, in addition, it continued to press its claims for monies due with no success. Numerous meetings and conversations took place during this period, but neither the Corps nor Magann would consider Diamond's claims for backpayment unless Diamond would agree to drop its claims and accept a Corps-specified sum of money.

The facts support Diamond's assertion that the specifications were in error; that the changed and differing site conditions and the change in order of work all created unanticipated problems for Diamond. Diamond had excavated sand substantially in excess of that for which it was paid, all of which was beneficially used by the Corps. Because of this standoff among the parties, Diamond was terminated and Merritt Construction Company was awarded a contract to complete the job. The remaining portion of the Project, being the easiest item to be accomplished, was completed by Merritt without any problems.

## CONCLUSIONS OF LAW

### A. AS TO PLAINTIFF MAGANN'S COMPLAINT

This court has jurisdiction over this action under 28 U.S.C. § 1332, there being diversity of citizenship between the plaintiff and the defendants and the matter in controversy exceeding $10,000 exclusive of interest and costs.

Plaintiff Magann is a Virginia corporation with its principal place of business in Portsmouth, Virginia.

Defendant Diamond is a Georgia corporation with its principal place of business in Savannah, Georgia, and defendant Aetna is

a Connecticut corporation with its principal place of business in Hartford, Connecticut.

Venue is proper in this court because the action arises out of the construction of the Murrell's Inlet Navigation Project at Murrell's Inlet, Georgetown, South Carolina.

It is Magann's theory that Diamond is bound by the administrative remedies defined under the General Provisions of the Construction Contract, basing this theory on the fact that Diamond assumed a binding obligation to perform all of the dredging work called for in the Contract between Magann and the Corps when it entered into the Subcontract with Magann on October 19, 1977. Magann further contends that Diamond breached this Subcontract because of its failure to complete the final dredging work (the Deposition Basin). It argues that Diamond's contractual obligations were not excused by application of either the doctrine of mutual mistake of fact or of impossibility of performance and that, as a result of Diamond's breach, it is entitled to damages.

Diamond takes the position that the Contract was materially breached by Magann and the Corps, with the final breach occurring on July 31, 1980, when Magann issued an ultimatum to the effect that Diamond would not be allowed to complete the dredging of the Deposition Basin unless it accepted the Corps' specified sum in complete settlement of all of its claims against Magann and the Corps.

The Corps' Specifications were incorporated into the Subcontract, and the Corps' personnel took an active part in supervising and controlling Diamond's activities. Magann and the Corps' personnel who supervised the Project were in possession of the General Design Memorandum, which contained information demonstrating that the specifications for the side slopes were defective, but Diamond was never furnished such information.

Diamond also contends that the Specifications were defective because of an incorrect classification of soil borings and because the pay prisms specifications did not adequately reflect the amount of material

to be dredged. It further alleges that this information should have been set out in the Invitation for Bids which would have alerted subcontractors to the problems that would be incurred. Additionally, Diamond contends that a change in the Order of the Work forced it to repeatedly dredge the same area, which was contrary to the Specifications and was shown clearly in the Design Memorandum to be infeasible.

Diamond charges further that on February 28, 1980, a Change Order was entered decreasing the amount of materials to be dredged from the Deposition Basin, which Order was later changed to increase the amount of material to be dredged back up to the original amount.

Thus, Diamond takes the position that the defective Specifications and the Change Orders resulted in a breach by Magann and not Diamond, who, under the circumstances, was justified in rescinding the Contract in response to these numerous breaches by the prime contractor.

■ In government contract law, failure to furnish adequate specifications which are possible of performance is a breach of contract. *Paisner v. United States*, 150 F.Supp. 835, 138 Ct.Cl. 420 (1957). *Helene Curtis Industries, Inc. v. United States*, 312 F.2d 774, 160 Ct.Cl. 437 (1963).

In 1965, this court in *Eastern Service Management Company v. United States* stated:

> Beginning with *United States v. Utah, Nevada and California Stage Co.*, 199 U.S. 414, 26 S.Ct. 69, 50 L.Ed. 251 [1905], there is a long line of decisions from the federal judiciary to the effect that when the government, in its Invitation to Bid, undertakes to prescribe or define certain existing conditions material to the performance of the contract it is bound to these specifications and liable for any increased cost arising from their substantial variation.

243 F.Supp. 302, 304 (E.D.S.C.1965). Both Magann's expert, John Romanosky, and Diamond's expert, Dr. Greg Richardson, testified that the soil borings had been misclas-

sified by the Corps as silty sand when, in fact, it was poorly graded sand which contained only minute quantities of fines and clays.

Romanosky thought the difference to be of lesser importance than Dr. Richardson, who is a specialist in the behavior of soils under varying conditions and who testified that the lack of fines and clays in the soil made a very material difference in the ability of the poorly graded sand to hold on the 1 vertical on 4 horizontal slope specified in the contract and generally affected the stability of the material under the conditions of tides present in the inlet. The Design Memorandum and the Hydraulic Model Study, which were not furnished to Diamond, were analogous to the definite project report which figured so prominently in *Perini Corporation v. United States*, 381 F.2d 403, 414, 180 Ct.Cl. 768 (1967), in which the United States Court of Claims held:

> Except for the large quantity of unmetered water on the first contract, which defendant made no effort to ascertain, there was available to the defendant all of the knowledge and information which plaintiff had at the time its bid was prepared. In addition, defendant had the benefit of the "Definite Project Report" which was not furnished to the Plaintiff and other bidders. That report set forth the dimensions of the old river channel, and stated that in a conference held in the Office of the Chief of Engineers on April 29, 1947, "it was decided that a steel sheet piling cutoff wall would be used in lieu of a grout curtain in this trough." However, the cutoff wall was omitted from the contract. Instead, the contract drawings required plaintiff to provide a U-shaped cofferdam for the second stage with the open side facing and immediately adjacent the old river channel. Thus, the contract made no provision for a barrier across the open side to prevent the substantial inflow of water that foreseeably would emanate from the old river channel. The existence of the old river channel was plainly shown by the contract borings, and was

well known to the Government geologist whom plaintiff consulted. The significance of defendants' error in this regard is demonstrated by the fact that the old river channel was the source of 60 percent to 70 percent of the water pumped from the second stage area. Sixty percent of the difference between the actual and estimated quantities of water pumped from the second stage area amounts to 3,799,290 units of pumping.

381 F.2d 403, 414 (Ct.Cl.1967).

The import of the definite project report and the failure of the Government to make it available to bidders is discussed at length in the *Perini* decision, and it is quite apparent that the definite project report was no different from the Design Memorandum and Hydraulic Model Studies in the instant case. Likewise, in *Hardeman-Monier-Hutcherson v. United States*, 458 F.2d 1364, 198 Ct.Cl. 472 (1972), a case in which the government was in possession of information concerning local conditions which were not made known to the contractor, the specifications were defective and much difficulty was encountered. The test borings which were part of the bid package did not accurately reflect the sub-surface soil conditions, and unusual and unanticipated soil conditions were encountered in some areas. The Court of Claims held:

> In the instant case it is apparent that (1) The Piggford and Drexel reports which were possessed by the Government and contained vital information concerning the weather and sea conditions at the site; (2) the weather and sea conditions were of paramount importance in the performance of the contract; (3) the Government deliberately chose not to reveal the information contained in the reports to the contractor—even when expressly requested to do so by the contractor; (4) the contractor bid with knowledge of the existence of the reports, but without knowledge of their contents; and (5) the contractor encountered adverse weather and sea conditions which were not reasonably foreseeable,

thereby resulting in lengthy delays in the performance of the contract.

 Under the circumstances the board reached the conclusion that the Government should have disclosed the contents of the reports to the contractor. We agree. There was no justifiable or excusable reason for the Government's refusal to disclose this vital knowledge to the contractor. The court holds that, as a matter of law, the defendant had a duty to disclose and share its superior knowledge and the failure to discharge this duty constituted a breach of contract. (Citation omitted.)

458 F.2d at 1372.

There is agreement among the commentators that if the material mistake of one party was caused by the other, either purposefully or innocently, or was known to him, or was of such character that he had reason to know of it, the mistaken party has a right to rescind the contract or recover damages for the breach. A. CORBIN ON CONTRACTS § 610 (3d Ed.1951); S. WILLISTON ON CONTRACTS §§ 1487 (3d Ed.1970).

Once dredging of the Pilot Channel and the Auxiliary Channel were begun, it became immediately apparent that the slopes of the channel would not hold on or near the 1 vertical on 4 horizontal slope specified.

The reason for this failure was not immediately apparent either to Diamond, Magann, or to the Contracting Officer's authorized representative, none of whom were aware of the misclassification of the soil boring. The Corps and Magann had the Design Memorandum in their possession, but neither consulted it.

The Contracting Officer's authorized representative, assuming the information in the Specifications to be correct and reliable, insisted on repeated re-dredging of the slopes.

 Diamond, through Magann, gave formal notice of unanticipated site conditions and changed conditions to the Contracting Officer by letter of December 11, 1978. This letter, which gave notice to the Contracting Officer of Magann's claims of differing site conditions, under the terms of the Contract and of the Subcontract, placed upon that Contracting Officer and his authorized representative the duty to investigate the claimed differing site conditions. The Corps did not investigate the site condition by any means other than to recompute its figures, which shed absolutely no light on Diamond's contention that the material being dredged would not hold on, or anywhere near, the angle prescribed in both the drawings and the Specifications. Sections 7–15.1 and 7–9.1 of the Technical Provisions of the Specifications dictated that the Corps should have done otherwise. The first investigation into that question was the study conducted by Soil & Material Engineers, Inc. which was undertaken at the request of and at the full expense of Diamond after the institution of the present litigation. Bidding contractors and subcontractors are not held to the knowledge and skill of geologists, geotechnical engineers, or fluid dynamic experts. They are entitled to rely on accurate and reasonably complete information supplied in the bid package and a reasonable site inspection.

 They are neither required or expected to conduct their own borings, conduct size distribution analyses or hydraulic model studies, nor to engage a geologist or geotechnical engineer to conduct such tests in addition to those done by and for the Government.

In the instant case, it required a year of discovery proceedings after the institution of litigation before the Design Memorandum and Hydraulic Model Study were discovered by Diamond and an exhaustive study by a geotechnical engineering firm to discover and elucidate the unique and unanticipated character, nature and behavior of the material which was dredged and the misgrading of the soil borings by the Corps. No reasonable bidder could have been expected to have accomplished this within the sixty days allowed to calculate his bid; nor did a reasonable bidder have

any reason, absent the availability to him of the Design Memorandum and Hydraulic Model Study, to suspect that there was any reason to do so if he had possessed the capacity to do so.

In *Eastern Service Management Company v. United States*, this court held:

Plaintiff also contends that the United States violated the agreement when the Contracting Officer refused to treat the discovery of the actual size of the building as a "change" under the contract. It is generally acknowledged that the broad purpose of such clauses is to make it possible for the government to obtain more favorable bids since the contractor is assured that he will be compensated for increased cost arising from conditions not anticipated by him and the government. See the excellent annotation: Public Contracts—Changed Conditions, 85 A.L.R.2d 211. Such clauses apply to variations in the amount of work to be done because of differences in stated specifications and actual conditions. See discussion by Mr. Justice Black in *United States v. Rice*, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 [1942].

In the Court's opinion these circumstances present just such a "change". At the time of this contract both parties were under the impression the building was of a particular size. Both knew that the size of the building was material to the cost of performing the cleaning contract. After the contract was executed and the work commenced it was discovered that the building was larger, thus materially increasing the cost of performance. In refusing to follow the "change" provision, the Contracting Officer breached the terms of the agreement.

243 F.Supp. at 306. (Footnote omitted.)

It is apparent from the evidence that Diamond continued to press its claims and Magann and the government continued to ignore the claims, insisting, contrary to the terms of the Contract, that the burden was on Diamond to prove its claims.

If the Corps and Magann had made the Design Memorandum available to Diamond, then it would have been apparent to Diamond that it was infeasible to dredge in unprotected areas, and Diamond would have insisted on the jetty system being in place prior to the commencement of dredging in the Auxiliary Channel.

■ Due to the large amount of overdredging caused by the failure of the channel slopes to hold and excessive shoaling, a booster pump was required to place the dredged materials. Diamond obtained such a booster pump and brought it to the job. At this time, however, Magann notified Diamond that it must settle all of its claims against the Corps and Magann or it would not be permitted to dredge the Basin. In addition, Magann refused to give a reasonable time extension which was needed because of the time expended in obtaining the booster pump. All of this amounted to breaches of the Contract and justified Diamond's action in rescinding the Contract.

■ The Subcontract provides that Diamond, being a subcontractor, is precluded from suing the United States in this court; and, because this case involves the Miller Act, 40 U.S.C. §§ 270a–270d, Magann is not only responsible for its own actions but is responsible for the actions of the Corps. *John A. Johnson & Sons, Inc., et al. v. United States to the use of the Baltimore Brick Co.*, 153 F.2d 534 (4th Cir.1946), *cert. denied*, 328 U.S. 865, 566 S.Ct. 1372, 90 L.Ed. 1636 (1946).

Consequently, there is no merit in Magann's suit against Diamond.

B. AS TO DIAMOND'S AMENDED COUNTERCLAIMS AGAINST MAGANN AND CROSS–COMPLAINT AGAINST MAGANN AND AETNA UNDER THE MILLER ACT, 40 U.S.C. §§ 270a–270d

This court's jurisdiction of Diamond's three counterclaims against Magann is founded in diversity. It has jurisdiction of the fourth counterclaim and the cross-complaint of the United States for the use of Diamond against Magann and Aetna under the Act of August 24, 1935, 49 Stat., known as the Miller Act.

There was an admitted contractual obligation on the part of Magann to advocate and advance the claims of Diamond for the additional work done due to changed conditions, unanticipated site conditions, defective Specifications, and the violation of the Contract and its Specifications which forced Diamond to dredge the Auxiliary Channel out of sequence and perform final channel dredging without the protection of the North and South Jetties as specified. The Corps' engineer testified that every cubic yard of sand dredged by Diamond was put to good and beneficial use by the government.

In *United States for the use of Coastal Steel Erectors, Inc. v. Algernon Blair, Incorporated and United States Fidelity and Guaranty Company*, 479 F.2d 638 (4th Cir.1973), the court held that the prime contractor's material breach of the Subcontract justified the subcontractor's rescinding the Contract and that under the circumstances it was entitled to recover a reasonable value of the material, equipment use and services furnished prior to the breach.

There is considerable merit to Diamond's counterclaims. Counterclaims 1, 2 and 3 are against Magann, and all are based upon defective Specifications, changed conditions, differing site conditions, improper application of Specifications, and impossibility. Counterclaim 4 and the cross-claim under the Miller Act are founded upon the same facts against Magann and Aetna. The findings upon counterclaim 4 and the cross-claim dispose of all the counterclaims.

■ I find that Diamond is entitled to recover such reasonable value of its materials, equipment use, and services.

In the fourth counterclaim of Diamond's amended counterclaims and cross-claim, Diamond prays judgment against Magann and Aetna under 40 U.S.C. §§ 270a–270d, the Miller Act.

That Act was passed by Congress on August 24, 1935, to insure payment to all persons supplying labor and material to be used in the prosecution of works on public projects of the United States, and requires the general contractor to furnish, in addition to a performance bond to protect the United States, a second bond designated a payment bond for the protection of all persons supplying labor and materials in the prosecution of the work provided for in the contract and for the use of each such person.

The Act requires the action to be brought by the United States for the use of the claimant, and Diamond so styled its fourth counterclaim. Thus, Diamond's fourth counterclaim is an action against both Aetna, as surety on Magann's Miller Act payment bond under 40 U.S.C. §§ 270a–270d, and Magann; and damages must be assessed under that Act. Magann's contention that the counterclaim is premature is without merit. *See, e.g., Thomas J. Dyer Co. v. Bishop International Engineering Co.*, 303 F.2d 655 (6th Cir.1962); *United States v. Alpha-Continental*, 273 F.Supp. 758 (E.D.N.C.1967).

■ Where, as here, there has been a breach of the subcontract by the general contractor who had incorporated the specifications of the prime contract into the subcontract, and regardless of whether the breach was occasioned by the general contractor or the government or, indeed, by both, the subcontractor can rescind the contract and seek restitution in *quantum meruit*. *See United States for the use of Coastal Steel Erectors, Inc. v. Algernon Blair, Incorporated and United States Fidelity and Guaranty Company*, 479 F.2d 638 (4th Cir.1973), and the cases cited therein. Diamond, thus, rescinded its Subcontract and is now seeking restitution in *quantum meruit.*

### C. DAMAGES

The damages of $1,570,074.18 prayed for in the fourth counterclaim represent *quantum meruit* damages unpaid to Diamond by Magann. Diamond has sued Magann in its counterclaim and has proven that its total costs, including overhead and profit, were $3,069,421.48; that it has been paid only $1,499,337.30 thereof, leaving a balance of $1,570,074.18. The figures are broken down as follows:

| | |
|---|---|
| Direct Labor | $1,152,985.15 |
| Fuel Oil | 255,556.59 |
| Parts and Material | 192,792.26 |
| Repairs | 137,159.13 |
| Materials/Overhead | 43,913.10 |
| Booster Pump (Rental) | 120,000.00 |
| Operations (Overhead) | 172,947.77 |
| Equipment Rental | 396,000.00 |
| General Administrative Overhead | 197,708.16 |
| Profit at 15% | 400,359.32 |
| TOTAL | $3,069,421.48 |

These figures are listed on the DD Form 633 introduced into evidence and confirmed by the unopposed testimony of Daniel Deloach, one of Diamond's accountants. They are clearly covered by the language of the Miller Act as labor and materials supplied in the prosecution of the work. Two of these items require some discussion. These are profit and the rental of the booster pump.

Regarding the question of subcontractor profits in Miller Act cases, see *United States for the use of Reichenbach v. Montgomery, et al.*, 155 F.Supp. 384 (E.D.Pa. 1957).

■ As to the booster pump, this item was constructed by Diamond as a result of the actions of Magann and the Corps and after changes in the Specifications for the amount of material to be dredged from the Deposition Basin had been made. The booster pump was finished and moved to Georgetown harbor where it remained for several days awaiting movement to Murrell's Inlet. It was constructed solely for the purpose of dredging the Deposition Basin and has never been used for any other purpose. Diamond does not ask for the cost of the construction, but for two months' rental at $2,000 per day, which, according to the uncontradicted testimony of Diamond's accountant, is the reasonable rental value established by the Blue Book of the American Rental Association, a commonly used standard for pricing rentals of construction equipment for such equipment.

In *United States for the use of Altman v. Young Lumber Company*, this court held:

> As to plaintiff's right to recover in *quantum meruit* for the value of its

equipment rental furnished to the job, this proposition has recently been sustained by the Fourth Circuit in a Miller Act case arising in this district. In *United States for the use of Coastal Steel Erectors, Inc. v. Algernon Blair, Inc.*, 479 F.2d 638 (4th Cir.1973), Coastal was a subcontractor to Blair for the performance of steel erection in the construction of a naval hospital. Coastal commenced performance, supplying its own cranes for handling and placing steel. Blair refused to pay for crane rentals, maintaining that it was not obligated to do so under the subcontract. Because of Blair's failure to make payments for crane rental, Coastal terminated its performance of the subcontract. The district court found that Blair's refusal to pay for crane use was a material breach justifying Coastal's terminating performance. However, the district court, under these facts, refused to award Coastal damages on the basis of *quantum meruit*. The Fourth Circuit reversed, aligning itself with those jurisdictions upholding the right of a plaintiff to seek recovery under *quantum meruit* in a Miller Act case. The court's holding is equally applicable here:

> In the present case, Coastal has, at its own expense, provided Blair with labor and the use of equipment. Blair, who breached the subcontract, has retained these benefits without having fully paid for them. On these facts, Coastal is entitled to restitution in *quantum meruit*. 479 F.2d at 641.

376 F.Supp. 1290, 1298 (D.S.C.1974).

As to material furnished in the prosecution of the work but not actually used being covered by the Miller Act, see *United States for the use and benefit of J.P. Byrne & Co., Inc. v. Fire Association of Philadelphia*, 260 F.2d 541 (2d Cir.1958).

It is clear that to hold otherwise would be inconsistent with both our holding in the *Altman* case, *supra,* and the Fourth Circuit's holding in *Coastal Steel Erectors, supra.*

■ Additionally, as to rental equipment, see *United States for the use of P.A.*

*Bourquin & Co., Inc., et al., v. Chester Const. Co., Inc., et al.,* 104 F.2d 648 (2d Cir.1939). And, as to profit and overhead, the Miller Act cases, see *Continental Casualty Co. v. Schaefer,* 173 F.2d 5 (9th Cir.1949), which cases specifically approve the total cost approach taken by Diamond here and upon which judgment in the instant case will be based. The ultimate loss in the case should be borne by the United States, but cannot in this case be shifted to the United States which is not a party to this action. Magann can pursue its claims against the United States in the Court of Claims or before the proper Board of Contract Appeals provided under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613. Since this is a transitional claim, the Contract having been entered into before the Contracting Officer's decision having been made after March 1, 1979, the effective date of the Contract Disputes Act, Magann has an election.

Magann argues that the damages occasioned by matters beyond the control of the prime contractor lie in claims against the Corps and not directly against it, and cites *McDaniel v. Ashton-Mardian Company,* 357 F.2d 511 (9th Cir.1966), and *Southern Fireproofing Company v. R.F. Ball Construction Company,* 334 F.2d 122 (8th Cir. 1964). *McDaniel* was a Miller Act case; however, it is distinguished from the instant case in that it dealt with delay damages and the subcontractor in that case knew when it entered into the subcontract that the work could very possibly not be completed within the days specified in the general contract. *Southern Fireproofing* was not a Miller Act case. It also dealt with damages resulting from delays, and here, too, the subcontractor was aware of the possibility of the delay weeks before execution of the subcontract.

Diamond having no privity of contract with the Corps has no procedures saving the Miller Act upon which it relies in its counterclaims for recovering its losses. Dependency of Magann's claims in the Court of Claims and before the Corps of Engineers' Board of Contract Appeals does not affect the Miller Act case. *Fanderlik-Locke Co. v. United States for the use of*

*M.B. Morgan,* 285 F.2d 939 (10th Cir.1960); *John A. Johnson & Sons, Inc., et al. v. United States to the use of the Baltimore Brick Co.,* 153 F.2d 534 (4th Cir.1946), *cert. denied,* 328 U.S. 865, 66 S.Ct. 1372, 90 L.Ed. 1636 (1946); *Wunderlich Contracting Company v. United States,* 240 F.2d 201 (10th Cir.1957), *cert. denied,* 353 U.S. 950, 77 S.Ct. 861, 1 L.Ed.2d 859 (1957). Since subcontractors, laborers and materialmen do not have enforceable rights against the United States for their compensation and cannot acquire liens on public projects, Congress by remedial legislation has provided the requirement that assures the guaranteed payment for materials and services used in the construction; and that remedial legislation is the Miller Act, 40 U.S.C. §§ 270a–270d. The payment bond here involved is conditioned as required by the Act for the protection of all persons supplying labor and materials in the prosecution of the Murrell's Inlet project. Since Magann breached the subcontract by refusing to allow Diamond to continue with the dredging subcontract unless Diamond dropped all of its claims against the Corps and Magann, by not recognizing changed conditions and changed site conditions, by having defective specifications, and by not giving time extensions, Diamond may recover in *quantum meruit* for the reasonable value of the services it rendered as set forth in *United States for the use of Coastal Steel Erectors, Inc. v. Algernon Blair, Incorporated and United States Fidelity and Guaranty Company,* 479 F.2d 638 (4th Cir.1973).

The cases in the Fourth Circuit and elsewhere specifically hold that while the fault and the breach may have been with the contracting officer rather than the prime contractor, nevertheless, the plaintiff is entitled to recover from the prime contractor's Miller Act surety when such a breach occurs. To this effect, see *John A. Johnson & Sons, Inc., et al., v. United States to the use of the Baltimore Brick Co.,* 153 F.2d 534 (4th Cir.1946), *cert. denied,* 328 U.S. 865, 66 S.Ct. 1372, 90 L.Ed. 1636 (1946) and *United States for the use of Ardmore Concrete Materials Company v. H.D. Williams, et al.,* 240 F.2d 561 (10th

Cir.1957). In *United States for the use of Llewellyn Machinery Corporation v. National Surety Corporation,* the Fifth Circuit held:

> Decisions of this court have made it clear that the statute and bonds given under it must be construed liberally, in order to effectuate the purpose of Congress declared in the act. In every case which has come before this Court, where labor and material were actually furnished for and used in part performance of the work contemplated in the bond, recovery was allowed, if the suit was brought within the period prescribed by the act. Technical rules otherwise protecting sureties from liability have never been applied in proceedings under this statute.

268 F.2d 610 (5th Cir.1959).

Title 41, United States Code Section 611 states:

> Interest on amounts found due contractors on claims shall be paid to the contractor from the date the contracting officer received the claim pursuant to Section 605(a) of this Title from the contractor until payment thereof. The interest provided for in this section shall be paid at the rate established by the Secretary of Treasury pursuant to Public Law 92–41 (85 Stat. 97) for the Renegotiation Board. (Pub.Law 95–563 § 12, Nov. 1, 1978, 92 Stat. 2389.)

This Code section is effective with regard to contracts entered into after November 1, 1978, and at the election of the contractor with respect to any claim pending at such time before the Contracting Officer.

It would be vastly inequitable to allow the general contractor and/or its surety in their claims against the government to receive interest dating from December 11, 1979 (the date of notice to Corps of Diamond's claim), and to deny to the subcontractor who actually sustained the loss any interest on its claim.

### D. CONCLUSION

 Accordingly, it is the conclusion of this court that the defendant, Diamond Manufacturing Company, Inc., as use Plaintiff in its fourth counterclaim, shall be

paid interest at the rate established by 41 U.S.C. § 611 from the time that notice was given to the contracting officer on December 11, 1979, until the amounts due under this judgment are paid by Magann and/or Aetna, its Miller Act Payment Bond Surety.

NOW, THEREFORE, it is

ORDERED, that the complaint of the plaintiff, W.F. Magann Corporation, be, and the same is hereby, dismissed. It is

ORDERED FURTHER, that judgment be, and the same is hereby, entered for Diamond Manufacturing Company, Inc., as use plaintiff in its counterclaim and cross-claim, against W.F. Magann Corporation and Aetna Casualty and Surety Company, jointly and severally, in the amount of One Million Five Hundred Seventy Thousand Seventy-Four and Eighteen/100ths ($1,570,-074.18) Dollars, plus interest as set out above, and all costs of this action.

AND IT IS SO ORDERED.